Filed 4/17/15

**CERTIFIED FOR PARTIAL PUBLICATION**<sup>*</sup>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B244989 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA093526) |
| v. | |
| STAFFORD JOEL SPICER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Tia Fisher, Judge. Affirmed as modified.

Neil Rosenbaum, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and Timothy M. Weiner, Deputy Attorneys General, for Plaintiff and Respondent.

---

\* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts C and D under the heading "Discussion."

In the underlying action, a jury found appellant Stafford Joel Spicer guilty of the 1985 murder of Joanna Jones. Appellant contends his prior conviction for receiving Jones's stolen car mandated the dismissal of the underlying action under Penal Code section 654, and that evidence of a 1974 incident of sexual misconduct was improperly admitted under Evidence Code section 1108; in addition, he maintains that his conviction for murder must be reversed due to insufficiency of the evidence and the ineffective assistance of his defense counsel.

In the published portion of this decision, we examine appellant's contentions under Penal Code section 654 and Evidence Code section 1108. Regarding the former, the focus of our discussion is on the "unavailable evidence" exception to the rule regarding multiple prosecutions in Penal Code section 654, as annunciated in *People v. Davis* (2005) 36 Cal.4th 510 (*Davis*). We conclude that under the exception, in cases where the prosecution has probable cause to charge the defendant with murder and a related crime and proceeds only on the related crime, it is not thereafter barred from bringing the murder charge upon obtaining additional evidence if, at the time it declined to proceed, the prosecution lacked evidence supporting the objectively reasonable belief that it could secure a murder conviction on the evidence then available, despite the exercise of due diligence in the investigation of the crimes. Regarding Evidence Code section 1108, we conclude that the admissibility of prior sexual misconduct under the statute does not hinge on whether there is sufficient independent evidence to prove that a sexual act occurred in the current case.

In the unpublished portion of this decision, we reject appellant's remaining contentions, with the exception of his challenge to the jury's special circumstance finding that he committed the murder during the commission, or attempted

2

commission, of a kidnapping. Because that error was not prejudicial, we modify the judgment to strike the finding, and affirm the judgment, so modified.

## RELEVANT PROCEDURAL BACKGROUND

In June 1985, an information was filed, charging appellant with receiving stolen property (Pen. Code, § 496), namely, Jones's car.[1] In February 1986, after pleading guilty to the charge, appellant was sentenced to a prison term of three years and eight months.

On December 16, 2011, an information was filed, charging appellant with Jones's murder. Accompanying the charge were allegations (§ 190.2, subd. (a)(17)) that the murder was committed while appellant was engaged in the commission, or attempted commission, of robbery (§§ 211, 211.5), kidnapping (§§ 207, 209, 209.5), and rape (§ 261). In addition, the information alleged that appellant had suffered a prior conviction for a serious felony (§ 667, subd. (a)(1)), and had been convicted of two prior felonies (§ 1203, (e)(4)). Appellant pleaded not guilty and denied the special allegations.

Prior to trial, the court denied appellant's motion to dismiss the action on the ground that it constituted a "multiple prosecution" under section 654. Later, during the trial, the court dismissed the prior conviction allegations at the prosecution's request. After a jury found appellant guilty of first degree murder, and found all the murder-related special circumstance allegations to be true, the trial court sentenced appellant to a term of life imprisonment without the possibility of parole. This appeal followed.

---

[1] All further statutory citations are to the Penal Code, unless otherwise indicated.

3

## FACTS

A. *Prosecution Evidence*

      1. *Events Preceding Jones's Murder*

In 1974, appellant lived near Linda Tulach's apartment in Long Beach. Tulach testified that on August 4, 1974, at approximately 4:00 a.m., she and her two-year-old son were in her apartment, sleeping in the same bed. At the sound of breaking glass, she awoke to see appellant holding a knife. He moved quickly to her bed and said, "Don't scream, bitch." When she asked, "Do you want money?," he replied, "No, I want you." While holding the knife, appellant touched Tulach's breasts and thigh, and ran his hands under the bed's mattress, saying that he was looking for weapons. After permitting Tulach to remove her son from the bedroom, appellant disabled her telephone and began running his hands along the legs of a pair of Tulach's pants he found on her bed. Tulach saw that her front door was unlocked, grabbed her son, and fled to a neighboring apartment. Several days later, while shopping, Tulach saw appellant in a parking lot, flagged down a police officer, and pointed out appellant as the man who had broken into her apartment.

Debra Perry was appellant's "common law . . . wife" from 1977 to 1985. According to Perry, appellant was known as "Plumber Joe," and he sold drugs obtained from Bill Brummet, who was a "major drug supplier" in Long Beach.

      2. *Jones's Disappearance*

In April 1985, Martine Carcamo was dating Joanna Jones and living in an apartment building on Ocean Boulevard in Long Beach, near the Pacific Holiday Towers apartment complex. Jones sometimes spent weekends with Carcamo in his apartment. On the afternoon of April 28, 1985, Jones parked her blue Camaro

close to his apartment and the Pacific Holiday Towers. After spending the night in Carcamo's apartment, Jones left for work the following morning, April 29, between 5:00 and 5:30. a.m.

Eugene Blackburn testified that in 1985, he worked as a security guard in the Pacific Holiday Towers. On April 29, 1985, his shift began at midnight and ended at 7:00 a.m. At 2:47 a.m., three people entered the building, one of whom signed the visitor sheet as "Joe Spicer." According to Blackburn, between 5:00 and 5:30 a.m., the same person left the building "going like a bat out of hell," and ran toward Ocean Boulevard.

After Jones left Carcamo's apartment, she failed to return his phone calls. He informed the police that she was missing. A few days later, while standing outside his apartment building, Carcamo saw Jones's Camaro pass by. The car was driven by appellant, and contained three other occupants. When Carcamo followed in his own car, appellant performed a u-turn and stopped. Carcamo also halted his car and yelled that he knew who owned the Camaro. The three passengers fled the Camaro on foot, and appellant drove away. Carcamo then reported to the police that he had seen Jones's car.

On May 2, 1985, Long Beach Police Officer Paul Chastain and his partner responded to a call regarding Jones's potential kidnapping and stolen car. The officers located Jones's unoccupied Camaro parked at a market. The three passengers who fled from Carcamo were identified as Karen Zirpel, Lorraine McCrimmon, and Gerald Kuhnke, who then used the name "John Rustin." The officers went to a nearby residence, where they saw appellant and Kuhnke. Although Kuhnke was detained, appellant fled from the officers.

Perry testified that after 11 p.m. on April 28, 1985, appellant left her apartment with two friends, and that she did not see him again until approximately

5

9:00 a.m. the following morning. On April 29, between 9:00 and 10:00 a.m., she walked to a convenience store with appellant, who pointed out a blue Camaro. He did not explain how he had obtained it. At some point, she saw appellant wipe down the car's interior. On May 2, Perry was arrested. Following her release, she had a phone conversation with appellant, who said that he was running from the police and that Brummet had "set him up." They discussed the stolen Camaro and the related investigation into a potential murder.

On May 8, when arrested at Perry's apartment, appellant said he had not killed the car's owner. Following his arrest, appellant made additional voluntary statements to Officer Chastain, who accompanied him to the police station. Appellant said that on April 29, at approximately 9:30 a.m., a man named "Sean" offered the Camaro to him for the purpose of arranging its sale. Sean wanted $1,500 for the car, of which appellant would get $300. Appellant took possession of the car, although he was aware that it had probably been stolen. Later, when a man followed appellant while he was driving the Camaro, he decided to abandon it. Appellant told Officer Chastain that he had been "set up" for the homicide by Brummet.

On May 8, Long Beach Police Department Detective William Maclyman interviewed appellant. Appellant told Maclyman that Sean had asked him to try to sell the Camaro for him.

### 3. *Discovery of Jones's Body*

On June 8, 1985, several weeks after Jones's disappearance, hikers in Azusa Canyon smelled a foul odor from a drainage tunnel under the roadway. Looking into the tunnel, they observed a decomposing body, later identified as Jones's, and reported it. Los Angeles County Sheriff's Department Sergeant Robert Perry, who

6

responded to the discovery, found Jones's unclothed body inside a culvert under a rural road, approximately 48 miles from Carcamo's apartment. Jones lay on her back with her legs spread apart, each touching a side of the culvert. Other than a pair of shoes near her feet, no items of her clothing were present.

Two days later, Dr. Lakshmanan Sathyavagiswaran performed an autopsy on Jones. Her body was decomposed, and showed maggot and animal activity. Dr. Sathyavagiswaran found an injury to her rib, as well as nine sharp force trauma injuries consistent with stab wounds to her neck, chest, and torso. Evidence of bleeding from the neck wounds supported the conclusion that she was alive when they occurred.

### 4. *Investigation (1985-1987)*

After appellant's arrest, fingerprints were lifted from the Camaro's exterior and its passenger area. Investigators also identified bloodstains on a mat and a cupholder found in the car's trunk.

On October 3, 1985, Sergeant Perry interviewed appellant at his attorney's office. Appellant stated that on the evening of April 28, 1985, he bought some methamphetamine and visited two friends, Gineen Bertram and Dave Metcalf, in Bertram's apartment in the Pacific Holiday Towers. During the night, appellant briefly left the apartment to buy drugs, and returned. At 8:00 a.m the following day, when appellant was walking on a street near the apartment to buy a soda, he encountered Sean, who was driving the Camaro, and asked appellant to arrange for its sale. Sean initially requested $2,500 for the car, but agreed to accept $500 or a quantity of methamphetamine. Appellant identified "Sean" as Rick Castle, whom appellant characterized as a close associate of Brummet's. Appellant described Castle as a white male who walked with a limp due to a motorcycle accident. In

7

addition, appellant maintained that Brummet wanted him off the streets, and had a bounty out on him.

Following the interview, Sergeant Perry unsuccessfully tried to locate Castle. The fingerprints lifted from the Camaro were determined not to match those of Castle or Brummet. At some point, investigators conducted a search of Brummet's residence, but found no evidence regarding Jones's murder.

On January 17, 1987, Sergeant Perry again interviewed appellant, who was then in prison. Appellant stated he had sold drugs for Brummet, but fell out with Brummet after he stole Brummet's gun. In 1984, Brummet threatened to kill him. Appellant further stated that he thought Brummet had "set him up." According to appellant, Sean asked him to sell the Camaro for $2,500, and required appellant to give him $500. Appellant also said that he abandoned the car because he was using it to transport drugs, and thought that Carcamo was a pursuing "narc officer."

### 5. *Subsequent Investigation*

In December 2008, Jones's murder was assigned to Los Angeles County Sheriff's Department Detective Stephen Davis, whose focus was on "cold cases."[2]

At some point in 2009, Detective Davis contacted Richard Castle. At trial, Castle denied knowing either appellant or Brummet; he also denied any involvement in Jones's murder and the theft of her car. According to Castle, in late 1984 or early 1985, he lived in Long Beach for two months, and suffered injuries in a motorcycle accident. After the accident, he and his roommate

---

[2]    In 2007, several of the fingerprints found in the Camaro were confirmed to match appellant's.

sometimes used methamphetamine. When Castle's roommate stole the settlement funds he had received following the accident, Castle moved to Arizona.

On May 19, 2009, Detective Davis interviewed appellant at his home in Nevada.[3] Appellant stated that in 1985, he was "really involved in drugs." The night before he obtained the Camaro, he visited Metcalf and his girlfriend in her apartment in the Pacific Holiday Towers. The apartment overlooked the street area around the building. The next day, appellant left the apartment and went home. Appellant initially stated that a "big black dude" brought the Camaro to him, but later said that the "black dude" introduced him to Sean, who had the car. Appellant also said that he obtained the car during the evening. Although appellant suspected the car was stolen, he saw it as a "way . . . to make some quick money." Appellant said that he intended to sell the car to Brummet, who wanted it. Appellant recalled no threats against him by Brummet, but stated that they once had an argument regarding whether appellant should carry a gun while he sold drugs. Appellant further stated that he was familiar with the Azusa Canyon area, which he had visited.[4]

In October 2009, Detective Davis conducted a second interview of appellant, and obtained a DNA sample from him.[5] During the interview, appellant stated that prior to obtaining the Camaro, he was acquainted with Sean, but did not

---

[3]    Excerpts of an audio recording of the interview were played for the jury.

[4]    Evidence was presented that appellant attended high school in Duarte and Covina, which are located in the area of Azusa Canyon.

[5]    An excerpt of an audio recording of the interview was played for the jury.

9

know his true name. Appellant further stated that he obtained the car when a "black dude" and Sean brought it to him at a garage where he "dealt."**6**

In August 2010, Detective Davis arranged for Gerald Kuhnke to testify during a grand jury proceeding related to appellant. When called as a witness in the trial below, Kuhnke testified that in 1985, he and Karen Zirpel were homeless in Long Beach, and often used methamphetamine. When arrested, Kuhnke usually provided the false names, "John Rustin" and "Jonathan Rustin" to the police.

Kuhnke further testified that on one occasion, he and Zirpel were passengers in a Camaro driven by someone he knew as "Joe the Plumber," who offered to sell it to them for $1,500. According to Kuhnke, Joe the Plumber said, "I killed a girl and buried her" in the hills or the woods.**7** Sometime later, after fleeing from the car, Kuhnke was arrested. Kuhnke did not relate Joe the Plumber's statement to anyone else, including investigating detectives, because "[he] was so freaked out" by it, and he "wanted away from [Joe the Plumber] as quickly as possible." Soon afterward, he and Zirpel moved to Wisconsin, where he "reclaimed [his] life" and eventually became a Christian pastor. Kuhnke stated that the remark "changed [his] life." At trial, Kuhnke was unable to identify appellant as "Joe the Plumber."

In connection with the grand jury proceeding, Detective Davis obtained a court order permitting the monitoring of appellant's phone. Before and after appellant's niece testified in the grand jury proceeding, appellant and an unspecified male engaged in recorded phone conversations. During the

---

**6** Detective Davis also interviewed Perry, who told him, inter alia, that appellant often carried a folding knife with a three- or four-inch blade.

**7** Kuhnke distinctly remember Joe the Plumber saying, "I killed a girl and buried her," but was uncertain whether he identified the location as in the hills or the woods.

10

conversations, the pair discussed questions to the niece during the proceeding regarding her visits to Azusa Canyon with appellant. Appellant said, "Everybody . . . knows where Azusa Canyon is . . . . [H]ell, I got more pussy in Azusa Canyon than . . . ." He also said, "[T]hey were asking her about . . . we ever went up to . . . the lake . . . in Azusa Canyon but hell, I've been up there a hundred thousand times, . . . it was a hang out place, it was a party place."

In 2012, DNA testing disclosed that the bloodstains on the mat and cupholder from the Camaro's trunk were mixtures, consistent with at least two contributors. Jones's DNA matched the profile of the major contributor to the mixture found on the mat, and appellant was included as a possible minor contributor to that mixture. Jones and appellant were also possible contributors to the mixture on the cupholder. The methods used to conduct the analyses were unavailable in the 80's.

At trial, DNA expert Tiffany Shew testified regarding the "random match probability" of the potential contributors to the bloodstains. Under that measure, which relies on ratios, the probability of a match increases with the denominator of the ratio. For Jones, the random match probabilities regarding the mixtures on the mat and the cupholder were one in 18,000,000,000 and one in 742,000, respectively. According to Shew, it was "highly probable" that Jones contributed to the bloodstains on the mat and the cupholder. For appellant, the analogous random match probabilities were one in 2,237 and one in 4,312. Shew stated that appellant could not be excluded as a contributor to the bloodstains.

B. *Defense Evidence*

Gineen Bertram testified that in 1985, she lived in her mother's apartment in Long Beach, and was a heavy user of methamphetamine. She and her boyfriend

11

David Metcalf knew appellant. According to Bertram, in April 1985, appellant once stayed overnight in her apartment. That evening, she and Metcalf went out drinking and picked up appellant, who was their drug supplier; the three then went to her apartment, where they spent the night doing drugs. Appellant left the apartment "a couple of times" to obtain more drugs. She stated: "[H]e just left and came back. There was no big hurry."

Mary Volpe testified that in 1985, she was a drug user and knew appellant, whom she then called "Plumber Joe." In April 1985, appellant once talked to Volpe's boyfriend regarding buying or selling a blue Camaro that appellant was driving. Volpe testified that appellant associated with a black male who was "a big dude." She did not know appellant to carry a knife.

## DISCUSSION

Appellant contends (1) that the trial court erred in declining to dismiss the underlying action, (2) that the evidence of his prior sexual assault on Tulach was improperly admitted, (3) that there was insufficient evidence to support his conviction, and (4) that his defense counsel rendered ineffective assistance. As explained below, we reject his contentions, with the exception of his challenge to the special-circumstance finding that the murder was committed during the commission, or attempted commission, of a kidnapping.

### A. *Propriety of Underlying Action*

Appellant maintains that under the double jeopardy clause of the United States Constitution and section 654, the trial court was obliged to dismiss the underlying action, in view of his 1986 conviction for receiving Jones's stolen Camaro. Because the double jeopardy clause and section 654 support distinct

12

claims regarding multiple prosecutions, we address them separately. (*In re Dennis B.* (1976) 18 Cal.3d 687, 691 (*Dennis B.*).)

### 1. *Double Jeopardy*

We begin with appellant's contention predicated on double jeopardy.[8] Generally, the double jeopardy clause of the United States Constitution operates as a restraint on prosecutors and the courts. (*People v. Fields* (1996) 13 Cal.4th 289, 298-299.) "The double jeopardy proscription . . . protects persons from being consecutively charged with violation of the same law or violation of laws so related that conduct prohibited by one statute is necessarily included within conduct prohibited by the other." (*Dennis B.*, *supra*, 18 Cal.3d at p. 691.) The "appropriate yardstick" for that determination is the so-called "elements test," which is based on a statutory comparison of the crimes. (*Scott*, *supra*, 83 Cal.App.4th at pp. 795-796; *People v. Kelley* (1997) 52 Cal.App.4th 568, 576 [for purposes of assessing existence of double jeopardy, the test "is whether each offense contains an element the other does not"].)

Under the elements test, appellant's conviction for receiving stolen property was separate and independent from the murder charged against him in the underlying prosecution. That charge was tried on theories of premeditated murder and felony murder predicated on the commission, or attempted commission, of

---

[8]     At the threshold, we observe that appellant has forfeited the contention, in view of his failure to enter a plea of double jeopardy before the trial court. (*People v. Scott* (2000) 83 Cal.App.4th 784, 792 (*Scott*).) Nonetheless, we address the contention on the merits because appellant maintains that his defense counsel's failure to assert the defense constituted ineffective assistance of counsel. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1044, fn. 5; *Scott*, *supra*, 83 Cal.App.4th at p. 792.) As we conclude that double
*(Fn. continued on next page.)*

kidnapping, robbery, and rape. Each theory constitutes a distinct offense, for purposes of double jeopardy. (See *People v. Wilson* (1996) 43 Cal.App.4th 839, 848-849 [under double jeopardy clause, premeditated murder and felony murder are different crimes]; *People v. Massie* (1998) 19 Cal.4th 550, 572-573 [under double jeopardy clause, predicate felony is element of felony murder].) None of the theories is a lesser included offense of receiving stolen property, as each requires a killing. Conversely, receiving stolen property is included within none of those theories. An item of stolen property is not required for them, with the exception of felony murder based on robbery, and it is otherwise well established that receiving stolen property is not a lesser included offense of robbery (*People v. Mora* (1956) 139 Cal.App.2d 266, 274). In sum, the double jeopardy clause of the United States Constitution did not bar the underlying action.

### 2. *Section 654*

We turn to appellant's contention predicated on section 654. As elaborated below (see pt. A.2.c., *post*), that contention relies primarily on the evidence available to the prosecution in 1985, as well as the prosecution's concession before the trial court that in 1985, there was probable cause to charge appellant with Jones's murder. Appellant maintains that the prosecution's failure to do so mandated the dismissal of the underlying action.

---

jeopardy principles did not bar the underlying action, no ineffective assistance is shown. (*Scott*, *supra*, 83 Cal.App.4th at p. 797.)

a. *Governing Principles*

As explained in *Kellett v. Superior Court* (1966) 63 Cal.2d 822, 825-826 (*Kellett*), in addition to circumscribing multiple punishments, section 654 establishes an independent rule regarding multiple prosecutions.[9]  Under that rule, "[w]hen . . . the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part, all such offenses must be prosecuted in a single proceeding unless joinder is prohibited or severance permitted for good cause.  Failure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the initial proceedings culminate in either acquittal or conviction and sentence." (*Id*. at p. 827.)  The purpose of the rule is to deter "needless harassment and the waste of public funds . . . ."[10]  (*Ibid*.)

The rule is subject to a so-called "unavailable evidence" exception traceable to double jeopardy principles.  (*People v. Witcraft* (2011) 201 Cal.App.4th 659, 671.)  Generally, the double jeopardy proscription is inapplicable when the prosecution "'is unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain that charge have not occurred or

---

[9]    Subdivision (a) of section 654 states:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.  An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

[10]    For purposes of the rule, the determination regarding the existence of a course of conduct differs from the analogous determination relevant to the prohibition in section 654 against multiple punishment.  (*Kellett*, *supra*, 63 Cal.2d at p. 827.)  To apply the rule, courts have adopted two different tests to determine a course of conduct.  (*People v. Valli* (2010) 187 Cal.App.4th 786, 797 (*Valli*)).  The first examines the extent to which crimes are separate in time and location, and the second examines the extent to which they require "separate proofs."  (*Id*. at pp. 797-802.)  Here, the parties do not dispute that
*(Fn. continued on next page.)*

have not been discovered despite the exercise of due diligence.'" (*People v. Scott* (1997) 15 Cal.4th 1188, 1202, quoting *Grady v. Corbin* (1990) 495 U.S. 508, 516, fn. 7, overruled on other grounds in *United States v. Dixon* (1993) 509 U.S. 688, 712.)

In *Davis, supra,* 36 Cal.4th at page 558, our Supreme Court held that the rule regarding multiple prosecutions in section 654 is subject to that exception. There, the defendant commandeered a car using a gun, kidnapped the driver, and took his belongings and car. (*Davis, supra,* at p. 518.) The defendant was later arrested while driving the car. (*Ibid.*) After the incident, the victim was unable to identify the defendant as the perpetrator, and the defendant pleaded guilty to a misdemeanor charge of taking a motor vehicle. (*Id.* at p. 558.) Later, after serving a sentence for that crime, the defendant told a third party how he had obtained the car. (*Ibid.*) As a result, he was prosecuted for robbery and kidnapping. (*Id.* at p. 556.) Applying the "unavailable evidence" exception, the Supreme Court held that section 654 did not bar that action, concluding that at the time of the defendant's initial conviction, neither the victim nor any other witness could have established that he kidnapped and robbed the victim. (*Davis, supra,* at p. 558.)

Here, we confront an issue regarding the "unavailable evidence" exception not addressed in *Davis*, namely, the quantum of evidence constituting the prosecution's possession of "facts necessary to sustain [the charge]." As noted above, the exception is triggered only when the prosecution, despite due diligence, first acquires facts of that kind *after* the initial conviction. Appellant argues that the exception was not triggered because in 1985, when the prosecution charged

appellant's 1986 conviction for receiving Jones's stolen Camaro was predicated on a single course of conduct that included her murder.

16

appellant with receiving stolen property, it had "all the facts necessary to sustain a murder conviction." In support, he cites the prosecution's acknowledgment that once Jones's body was discovered, there was probable cause to charge him with murder.

The issue before us thus implicates the prosecution's discretion regarding the charging of crimes. The prosecution may not charge a crime without "probable cause," that is, evidence supporting a reasonable suspicion that the defendant committed the crime. (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 473.) That showing "need not be sufficient to support a conviction." (*Ibid*.) However, when the prosecution has probable cause to charge a crime, the decision to do so is a matter of prosecutorial discretion. (*Valli*, *supra*, 187 Cal.App.4th at p. 801.) As our Supreme Court has explained, notwithstanding the constitutional guarantees of due process and a speedy trial, "[a] court should not second-guess the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges." "'Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. . . . A prosecutor abides by elementary standards of fair play and decency by refusing to seek indictments until he or she is completely satisfied the defendant should be prosecuted and the office of the prosecutor will be able to promptly establish guilt beyond a reasonable doubt.'" (*People v. Nelson* (2008) 43 Cal.4th 1242, 1256 (*Nelson*), quoting *People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 914, 915.)

b. *Underlying Proceedings*

At the preliminary hearing in the underlying action, the prosecution presented evidence similar to that later admitted at trial, although it offered no

DNA evidence or testimony from Kuhnke regarding the remarks he heard by "Joe the Plumber" in 1985. Prior to trial, appellant filed a motion to dismiss the action under section 654, contending that at the time of his conviction for receiving stolen property, "the prosecution was or should have been aware [of] the instant case."

The prosecution's opposition relied on the "unavailable evidence" exception set forth in *Davis*, stating: "[T]he various agencies involved in the disappearance and murder of . . . Jones acted with due diligence. By the time Jones'[s] body was found . . . , there was no doubt probable cause to arrest [appellant] for Jones'[s] murder. Additionally, there was sufficient evidence to charge [him] . . . . However, despite the best efforts of investigators from three different agencies, sufficient evidence had not been developed to meet the prosecution's burden at trial -- proof beyond a reasonable doubt." The prosecution maintained that following appellant's conviction for receiving stolen property, three critical items of evidence had been acquired: appellant's 2009 interviews, which conflicted with his earlier accounts of the relevant events; appellant's 2010 phone conversations regarding his familiarity with Azusa Canyon as a place for getting "pussy"; and the results of the DNA testing regarding the contributors to the bloodstains on the items in the Camaro's trunk.

At the pretrial hearing on appellant's motion, the trial court considered the testimony from the preliminary hearing and the then-available results of the DNA testing.[11] In denying the motion, the court concluded that after 2008, the

---

**11**     It appears that the DNA testing results before the court were preliminary findings, rather than the final findings presented at trial. Those preliminary findings nonetheless supported the reasonable inference that Jones and appellant were "possible" contributors. *(Fn. continued on next page.)*

18

prosecution acquired "new evidence . . . [n]ot triggered by a failure to investigate the first time" that supported "an objectively reasonable belief of the probability of a conviction" by a jury applying the beyond-a-reasonable-doubt standard of proof. The court stated that appellant's 2009 interviews raised the reasonable inference that he lied to investigators in 1985, as they "completely contradict[ed]" some of his prior statements; in addition, the court stated that the 2010 phone conversations disclosed appellant's familiarity with Azusa Canyon as a place to "have sex." The court acknowledged that the DNA testing did not conclusively establish that appellant contributed to the bloodstains on the items in the Camaro's trunk, but noted that the testing represented "new technology."

c. *Analysis*

As explained below, we discern no error in the trial court's ruling. To the extent appellant challenges the court's determinations of law regarding the application of the "unavailable evidence" exception, we examine those determinations de novo. (See *In re R.L.* (2009) 170 Cal.App.4th 1339, 1343, fn. 4.) To the extent appellant challenges the court's factual determinations relating to the exception, we review those determinations for the existence of substantial evidence. (*Davis*, *supra*, 36 Cal.4th at p. 558; *Barriga v. Superior Court* (2012) 206 Cal.App.4th 739, 748.)

Our research has disclosed no decision addressing the court's key legal determination, namely, that the exception applies when the prosecution exercised due diligence in its investigation and had probable cause to charge a defendant

In asserting the motion under section 654, appellant acknowledged that his DNA was on the cup holder and mat found in the Camaro's trunk.

19

with murder in conjunction with a closely related crime, but deferred filing the murder charge until it acquired evidence supporting the objectively reasonable belief that it could sustain a murder conviction. Nonetheless, we find guidance from *United States v. Stearns* (9th Cir. 1983) 707 F.2d 391 (*Stearns*).

Although *Stearns* addressed a claim of double jeopardy, our Supreme Court cited *Stearns* with approval in holding that the rule regarding multiple prosecutions under section 654 is subject to the "unavailable evidence" exception to the double jeopardy proscription. (*Davis*, *supra*, 36 Cal.4th at p. 558.) In *Stearns*, a married couple disappeared in 1974 after anchoring their yacht in the lagoon of an uninhabited atoll. (*Stearns, supra,* 707 F.2d at p. 392.) Several months later, the yacht was discovered in the possession of the defendants, who had repainted it and registered it under a new name. (*Ibid*.) Following their arrest, they claimed that the married couple had drowned, and offered conflicting explanations regarding how they acquired the yacht. (*Ibid*.) Suspecting foul play, investigators searched the atoll and lagoon, but found no evidence regarding the married couple's fate. (*Id*. at p. 394.) In 1981, after the defendants had been convicted of theft, the missing woman's skull and a box containing one of her bones were discovered underwater near the atoll, and tests revealed that her bones had been subjected to "high temperatures." (*Id*. at p. 392.) The defendants were thereafter charged with felony murder. (*Ibid*.) After the trial court denied the defendants' motion to dismiss the action on the basis of double jeopardy, the Ninth Circuit determined that the "unavailable evidence" exception was applicable because the prosecution had exercised due diligence in its early investigation. (*Id*. at p. 394.) In so concluding, the Ninth Circuit stated that due diligence did not require the use of "extraordinary" methods: "A more thorough search may have

20

been possible. . . . A complete search of the lagoon, however, would have required . . . an extraordinary amount of time, effort, and money." (*Ibid*.)

*Stearns* is instructive regarding the relationship between the "unavailable evidence" exception and prosecutorial discretion regarding the charging of crimes. Its analysis reflects a determination that the prosecution's possession of facts raising a suspicion of "foul play" prior to the defendants' initial convictions did not bar the application of the exception. In addition, it reflects a determination that the prosecution's delay in obtaining evidence reasonably likely to sustain a murder conviction did not preclude the exception's application, as the prosecution displayed ordinary diligence in its initial investigation.**12**

---

**12** We also find guidance from *Valli*, *supra*, 187 Cal.App.4th 786. Although *Valli* does not address the "unavailable evidence" exception to the rule against multiple prosecution in section 654, it establishes that the rule is properly construed in light of the prosecutor's discretion regarding the charging of crimes. There, following a murder, a witness identified the defendant as the perpetrator to officers who responded to the crime. (187 Cal.App.4th at p. 791.) The day after the murder, other officers on patrol saw the defendant in a van, and after a lengthy high-speed chase, arrested him. (*Id*. at pp. 791-792.) After the defendant was acquitted of murder, he was charged in a separate action with felony evading. (*Id*. at pp. 792-793.) The trial court denied his motion under section 654 to dismiss that action, concluding that the murder and the evading did not constitute a single course of action. (*Valli*, *supra*, at p. 793.) In affirming on that ground, the appellate court rejected the contention that section 654 mandated the joinder of the murder and evading charges in a single action because the prosecution had full knowledge of the facts of both crimes. (*Valli, supra,* at pp. 794-802.) The appellate court stated: "The decision as to appropriate charges is a matter of prosecutorial discretion. '[P]rosecutorial discretion is basic to the framework of the California criminal justice system. [Citations.] This discretion, though recognized by statute in California, is founded upon constitutional principles of separation of powers and due process of law.' [Citation.] We refuse to require prosecutors to proceed against a defendant on all known charges simultaneously." (*Valli*, *supra*, 187 Cal.App.4th at p. 801, quoting *People v. Jerez* (1989) 208 Cal.App.3d 132, 137.)

21

We agree with the trial court that for purposes of the "unavailable evidence" exception to the rule in section 654, the prosecution first possesses "facts necessary to sustain the charge" when it secures evidence supporting the objectively reasonable belief that it "'will be able to promptly establish guilt beyond a reasonable doubt'" (*Nelson*, *supra*, 43 Cal.4th at p. 1256). Thus, the exception applies when the prosecution, though having probable cause to charge a defendant with murder and a related crime, declines to file the murder charge prior to the defendant's conviction for the related crime because it lacks facts to support the objectively reasonable belief that it can prove the murder charge at trial, despite due diligence in the investigation of the crimes. To hold otherwise would be to encourage prosecutors to overcharge -- by filing charges they lacked an objectively reasonable basis to believe would result in conviction -- thus improperly cabining the prosecutorial discretion that is a basic element of the criminal justice system.

That discretion is not unlimited. In the relatively few cases where the "unavailable evidence" exception is invoked, the court must decide whether the exercise of prosecutorial discretion not to pursue the later filed charges was reasonable. For the reasons we next discuss, we discern no error in the trial court's determination that the evidence supporting an objectively reasonable belief that appellant would be convicted of Jones's murder was not within the prosecution's possession in 1985 and could not have been obtained despite due diligence.[13]

---

[13] In our view, under the "objectively reasonable belief" standard, the trial court's task resembles the assessment required when a defendant seeks a new trial on the basis of insufficiency of the evidence. "In reviewing a motion for a new trial, the trial court must weigh the evidence independently . . . guided by a presumption in favor of the correctness

*(Fn. continued on next page.)*

Appellant contends the prosecution acquires "facts necessary to sustain [the charge]" when it obtains evidence sufficient to support a determination of guilt on appeal, that is, when it has substantial evidence of guilt, for purposes of appellate review. We disagree. As noted above, the focus of the prosecution's assessment is whether it "'will be able to promptly establish guilt beyond a reasonable doubt'" at *trial*. (*Nelson*, *supra*, 43 Cal.4th at p. 1256.) In a criminal proceeding, "'"[t]he functions of the jury include the determination of the credibility of witnesses, the weighing of the evidence, and the drawing of justifiable inferences of fact from proven facts."'" (*People v. Ross* (1953) 120 Cal.App.2d 882, 886, quoting *Curley v. U.S.* (1947) 160 F.2d 229, 232.) In contrast, on review for the existence of substantial evidence, appellate courts "determine, without reweighing the evidence, whether there was sufficient evidence to permit a rational jury to convict." (*People v. Salgado* (2001) 88 Cal.App.4th 5, 15.) Accordingly, the prosecution, in determining whether its evidence with sustain a charge at trial, must assess the weight of that evidence, a consideration not implicated in appellate review. We decline to construe the "unavailable evidence" exception to impose upon the prosecution a yardstick for assessing evidence fundamentally unrelated to the exercise of prosecutorial discretion regarding the charging of crimes.

---

of the verdict and proceedings supporting it. [Citation.] The trial court 'should [not] disregard the verdict . . . but instead . . . should consider the proper weight to be accorded to the evidence and then decide whether or not, in its opinion, there is sufficient credible evidence to support the verdict.'" (*People v. Davis* (1995)10 Cal.4th 463, 523-524, quoting *People v. Robarge* (1953) 41 Cal.2d 628, 633.) Similarly, for purposes of the "unavailable evidence" exception, the trial court should independently weigh the evidence available to the prosecution when it deferred charging a crime, as well as the "newly acquired" evidence, to determine whether there were objectively reasonable bases for the initial decision to defer and the later decision to charge, without attempting to "second-guess" those decisions (see *Nelson*, *supra*, 43 Cal.4th at p. 1256).

Applying the "objectively reasonable belief" standard above, we conclude that the trial court did not err in finding that the exception, so understood, was applicable in the underlying action. In 1985, prior to appellant's conviction for receiving stolen property, the prosecution had evidence establishing "probable cause" regarding Jones's murder, that is, evidence supporting a reasonable suspicion that appellant committed the crime. That evidence was provided by appellant's abrupt departure from the Pacific Holiday Towers at approximately the time Jones left Carcamo's apartment, appellant's possession of the Camaro shortly after her disappearance, and his subsequent conduct, including his flight from investigating officers prior to his arrest. In addition, appellant's prior sexual assault potentially linked him to Jones's murder, as there was evidence that she had been sexually assaulted.

Nonetheless, despite diligent investigation, the prosecution lacked evidence regarding certain key issues, namely, when Jones was murdered, why she was taken to Azusa Canyon, and how and when she was taken there. That evidence was required to rebut appellant's theory that someone else -- for example, Brummet -- kidnapped Jones, gave her car to Sean, and murdered her. Those gaps in the prosecution's evidence were filled after 2008.

The trial court reasonably concluded that the newly developed evidence was not the result of a prior failure of due diligence. In December 2008, Jones's murder was assigned to Detective Davis, who reinvestigated "cold cases." The initial items of new evidence that Davis developed could not have been obtained prior to appellant's conviction for receiving stolen goods, namely, appellant's 2009 accounts of his acquisition of Jones's car, which differed materially from the accounts he provided in 1985 and 1986. After obtaining that evidence, Davis also sought DNA testing, which appellant does not dispute represented "new

24

technology," and which strongly suggested that Jones and appellant contributed to the bloodstains on the items found in the Camaro's trunk. Moreover, Davis secured appellant's 2010 recorded phone conversations, in which he revealed his familiarity with Azusa Canyon as a place for having sex. As those conversations were directly prompted by the 2010 grand jury proceeding, nothing before us suggests that a similar wiretap in 1985 or 1986 would have produced that evidence.

The newly acquired evidence provided concrete support for the theory that appellant murdered Jones in Azusa Canyon on the morning of April 29, 1985, just hours before he displayed the Camaro to Perry, his common law wife. To begin, the evidence showed that in all likelihood, Jones was transported while alive to Azusa Canyon in the Camaro's trunk on that morning. Although the DNA evidence itself did not conclusively identify appellant as the murderer, it strongly suggested that Jones contributed to the bloodstains on the items from the Camaro's trunk, and thus rendered it likely that she had been transported to Azusa Canyon in the trunk. Furthermore, she probably was alive before arriving there, as she died of neck wounds inflicted by a knife or similar weapon, yet the trunk disclosed little blood. In view of other evidence that appellant openly drove the Camaro from the time he displayed it to Perry until his arrest, the DNA evidence showed that Jones probably died before Perry first saw the car.

The newly acquired evidence also placed the spotlight on appellant as Jones's murderer. The 2009 interviews supported the reasonable inference that appellant had lied in 1985 regarding how he obtained the Camaro. From 1985 to 1987, appellant maintained he obtained the car from Sean, an acquaintance he encountered on the street on the morning of April 29. He attributed Jones's death and the theft of her car to Brummet, with whom he claimed to have an antagonistic

25

relationship, and posited that Brummet had "set him up" for the murder. In contrast, in 2009, appellant said he did not receive the car until the evening of April 29, that a "big black dude" brought the car to his attention, and that the transfer took place in a garage. Further contradicting his earlier statements, he claimed that he intended to sell the car to Brummet, with whom he enjoyed an essentially good relationship. Furthermore, appellant's unsolicited statements recorded in the 2010 phone conversation supported the reasonable inference that appellant took Jones to Azusa Canyon because it was a place he went to have sex. The new evidence thus provided material support for the theory that appellant committed the murder.

Appellant contends that in 1985, the prosecution possessed evidence sufficient to sustain a murder conviction against him. Aside from the facts discussed above, he relies on certain remarks he made when arrested, namely, that he did not kill "that girl" or "anyone." He argues that his flight from police officers prior to his arrest showed a "consciousness of guilt," and that his remarks upon arrest demonstrated knowledge of Jones's death before the discovery of her body. However, viewed in context, those items of evidence supported no compelling inference that he murdered Jones. Prior to appellant's conviction for receiving stolen property, the prosecution knew that appellant claimed to be aware that the Camaro had been stolen when he obtained it from Sean. For that reason, a jury was likely to regard appellant's flight as manifesting only his awareness that he had received stolen goods. In addition, the prosecution was aware that prior to appellant's arrest, he talked to Perry, who then knew from her own arrest that there was an investigation into the potential murder of the girl who owned the Camaro. A jury was thus likely to conclude that appellant's pre-arrest contact with Perry nullified the inference that he knew of a potential murder only because he was the

26

murderer. Accordingly, in 1985, the prosecution reasonably concluded that appellant's flight and remarks would not result in a murder conviction.

Appellant also contends that in 1985, the prosecution did not exercise due diligence in investigating Jones's murder because it could have, but failed, to secure Kuhnke's evidence regarding Joe the Plumber's remark that he had killed a girl. Pointing to a police report regarding Kuhnke's arrest, appellant maintains that officers never adequately questioned Kuhnke regarding the stolen Camaro. The report states that upon arrest, Kuhnke and Zirpel "denied knowledge of the car being stolen until confronted by [Carcamo]. They then became suspicious and fled." To show that Kuhnke never was interrogated or queried, appellant relies on the report, which states that on May 2, 1985, when booked, Kuhnke and Zirpel "were not questioned about the stolen car, but . . . made several voluntary statements."

The record does not establish that the prosecution failed to obtain Kuhnke's evidence in 1985 due to a lack of diligence. In fact, the record shows that Kuhnke was interviewed by two different officers -- Officer Chastain and Detective Maclyman -- after his arrest, and that Maclyman's interview with Kuhnke took place on May 3, 1985, after Kuhnke was booked. Furthermore, Kuhnke's testimony established that in 1985, it was unlikely he would have disclosed the remark, regardless of how he was questioned. In addition to Kuhnke's admission that he then often lied to police to protect himself, he explained that he did not reveal the remark to the investigating detectives or anyone else because it "freaked [him] out" and he just "wanted away from him as quickly as possible." Indeed, shortly thereafter he moved Wisconsin. According to Kuhnke, the remark triggered a change in his life, and "scared [him] straight."

27

Appellant further suggests that the prosecution failed to secure three other items of evidence in 1985 for want of diligence. He argues (1) that it was not until 2009 that investigating officers learned from Perry that appellant often carried a knife, even though they interviewed her in 1985, and (2) that in 1985, appellant's knowledge of the Azusa Canyon area could have been discovered through a search of public records or a wiretap. Although appellant does not dispute that the DNA evidence submitted at trial was unavailable in 1985, he also argues (3) that certain tests then possible might have established that the bloodstains on the items found in the Camaro's trunk were "consistent" with his blood. We reject these contentions. Because knives are common and easily acquired, appellant's possession of a knife would not have materially enhanced the evidence available in 1985, had the prosecution then known that fact. Furthermore, it is speculation that in 1985, the prosecution had sufficient legal basis to obtain a wiretap, and that such a wiretap -- or public records -- would have disclosed the salient information obtained in 2010, namely, that appellant knew Azusa Canyon as a place to have sex. Finally, nothing in the record shows that the blood tests specified by appellant would have identified him -- or Jones -- in any meaningful way as a contributor to the bloodstains. In sum, the trial court did not err in denying appellant's motion under section 654 to dismiss the underlying action.

B. *Admission of Tulach's Testimony*

Appellant contends that the trial court erred in admitting Tulach's testimony under Evidence Code section 1108. For the reasons explained below, we reject the contention.

28

### 1. *Governing Principles*

Subdivision (a) of Evidence Code section 1108 provides that "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code s]ection 1101, if the evidence is not inadmissible pursuant to [Evidence Code s]ction 352."[14] Subdivision (d)(1)(A) of Evidence Code section 1108 defines "[s]exual offense" to include rape (Pen. Code, § 261). Evidence of an uncharged sexual offense is admissible under Evidence Code section 1108. (*People v. Reliford* (2003) 29 Cal.4th 1007, 1009.)

In determining whether to admit Tulach's testimony under Evidence Code sections 1108 and 352, the trial court was obliged to consider "its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the [trier of fact] . . . , its similarity to the charged offense, its likely prejudicial impact on the [trier of fact], the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission . . . . [Citations.]" (*People v. Falsetta* (1999) 21 Cal.4th 903, 917.) The court's ruling is reviewed for an abuse of discretion. (*People v. Wesson* (2006) 138 Cal.App.4th 959, 969.)

---

14      Evidence Code section 1101 states that except as provided in section 1108 and other sections, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (§ 1101, subd. (a).)

Under Evidence Code section 352, the trial court has the discretion to exclude evidence when "the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time. [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125.)

"[T]he Legislature's principal justification for adopting [Evidence Code] section 1108 was a practical one:  By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence.  The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations.  [Evidence Code s]ection 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes.  [Citation.]" (*People v. Falsetta, supra,* 21 Cal.4th at p. 915.)

Evidence Code Section 1108 marks a departure from Evidence Code section 1101, which limits the admission of prior criminal conduct.   As our Supreme Court has explained,  "[b]efore [Evidence Code] section 1108 was enacted, Evidence Code section 1101 governed the admission of prior criminal conduct, and a body of law developed concerning how similar the prior conduct had to be to the charged crime; the required degree of similarity varied depending on the use for which the evidence was offered.  [Citation.]  'All of that radically changed with respect to sex crime prosecutions with the advent of section 1108 . . . . [Evidence Code s]ection 1108 now "permit[s] the jury in sex offense . . . cases to consider evidence of prior offenses *for any relevant purpose"* [citation] subject only to the prejudicial effect versus probative value weighing process required by [Evidence Code] section 352.'  [Citation.]  'In enacting Evidence Code section 1108, the Legislature decided evidence of uncharged sexual offenses is so uniquely probative in sex crimes prosecutions it is presumed admissible without regard to the limitations of Evidence Code section 1101.'  [Citation.]  Or, as another court put it, '[t]he charged and uncharged crimes need not be sufficiently similar that evidence of the latter would be admissible under Evidence Code section 1101, otherwise Evidence Code section 1108 would serve

no purpose. It is enough the charged and uncharged offenses are sex offenses as defined in section 1108.' [Citation.]" (*People v. Loy* (2011) 52 Cal.4th 46, 63 (*Loy*).)

### 2. *Underlying Proceedings*

Prior to trial, the prosecution sought leave to present testimony from Tulach regarding the 1974 incident, during which appellant entered her apartment at night, touched her breast and thigh, and said that he wanted "her," rather than money. In opposing the request, appellant maintained that the 1974 incident was insufficiently similar to Jones's murder, relying in part on decisions predating the enactment of Evidence Code section 1108.

The court concluded that Tulach's testimony was admissible under Evidence Code section 1108, subject to certain restrictions intended to limit potential prejudice to appellant. The court determined that Tulach's testimony was "highly probative" regarding a central issue, namely whether appellant raped or attempted to rape, Jones. Furthermore, to the extent the prosecution sought to admit the evidence to resolve that issue, the court concluded the 1974 incident was not overly remote, and there was no substantial danger of undue prejudice. Nonetheless, the court determined that the 1974 incident was inadmissible regarding another "bottom line" issue, namely, the identity of Jones's assailant. To preclude prejudice to appellant, the court stated that it would give a jury instruction specifying the issues for which Tulach's testimony could be considered.

Following the presentation of evidence at trial, the court instructed the jury with a modified version of CALCRIM No. 1191, which stated that if the jury found appellant had committed the uncharged crimes in 1974, it was permitted,

but not required, to conclude that appellant acted with the intent to commit felony murder predicated on rape, had a scheme or plan to do so, or was disposed or inclined to commit sexual offenses.

### 3. *Analysis*

Appellant's principal contention is that the trial court erred in admitting Tulach's testimony because the 1974 incident was too dissimilar, and too remote in time, from Jones's murder. We disagree.

In *People v. Robertson* (2012) 208 Cal.App.4th 965, 970, the defendant was charged with kidnap for rape and related offenses. The evidence at trial showed that in 2009, the defendant lured his victim into a garage, locked it, and sexually assaulted her. (*Id*. at pp. 972-973.) The court also admitted evidence under Evidence Code section 1108 that approximately 34 years earlier, in 1974, the defendant committed a rape and kidnapping. (*People v. Robertson, supra,* 208 Cal.App.4th at pp. 987-988, 992.) During that incident, the defendant picked up a hitchhiker, drove her to an isolated field, and raped her. (*Ibid*.) In affirming the admission of the 1974 incident, the appellate court rejected a contention that the prior incident was too remote, stating that """"substantial similarities between the prior and the charged offenses balance out the remoteness of the prior offenses. """" (*Id*. at p. 992.) Applying that standard, the appellate court determined that the similarities between the 1974 and 2009 crimes were sufficient to support the trial court's ruling. (*Id*. at pp. 992-994.)

We reach the same conclusion here. During each incident, appellant attacked a woman and took action to isolate his victim. Furthermore, each incident commenced in the early morning, and took place in, or otherwise involved, the same area of Long Beach. In view of those similarities, the trial

court did not err in admitting evidence of the 1974 incident, even though it occurred 11 years prior to the crimes charged against appellant in the instant case.

Appellant also contends that the court erred in admitting the 1974 incident under Evidence Code section 1108 because there was little other evidence that Jones was, in fact, subject to a sexual assault, or attempted sexual assault, aside from her lack of clothing when discovered. He argues that "evidence that the defendant committed other sex crimes is not admissible under [Evidence Code] section 1108 unless, independent of that evidence, there is sufficient evidence to prove that a sexual act occurred in the current case." For the reasons discussed below, the 1974 incident was properly admitted to resolve the key issue regarding a sexual offense presented at trial, namely, whether appellant, in attacking Jones, acted with intent to commit a rape (see pt. C.2., *post*).

Nothing in Evidence Code section 1108 suggests that prior sexual misconduct is admissible only if there is sufficient independent evidence that the currently charged sex crime actually involved a "sex act." On the contrary, the statute authorizes the admission of such misconduct in criminal actions in which the defendant is "accused" of enumerated sexual offenses, including attempted rape and other attempted sex crimes. (Evid. Code, § 1108, subds. (a), (d)(1)(A), (d)(1)(F).) Evidence Code section 1108 thus permits the admission of prior sexual misconduct to establish charged offenses that require no accomplished "sex act," such as attempted rape (*People v. Clark* (2011) 52 Cal.4th 856, 948 [attempted rape requires only conduct exceeding mere preparation showing that defendant put plan into action]).

Furthermore, under the circumstances presented here, the trial court did not err in admitting appellant's prior sexual misconduct. Evidence Code section 1108 authorizes the trial court to admit such misconduct "'*for any relevant purpose*,'"

without engaging in the purpose-specific analysis required under Evidence Code section 1101. (*Loy*, *supra*, 52 Cal.4th at p. 63, quoting *People v. James* (2000) 81 Cal.App.4th 1343, 1353, fn. 7, overruled on another ground in *Loy*, *supra*, 52 Cal.4th at pp. 73-74.) Under the latter statute, the target purpose dictates the degree of similarity between prior and current offenses required for admissibility. "The least degree of similarity . . . is required in order to prove intent." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) In contrast, "[t]he greatest degree of similarity is required . . . to prove identity." (*Id*. at p. 403.)

Although the trial court admitted the 1974 incident under Evidence Code section 1108, its carefully considered ruling was informed by Evidence Code section 1101, as the court referred to the stringent standard for proof of identity under the latter statute in limiting the use of the 1974 incident. Under Evidence Code section 1101, evidence of a prior sexual offense is admissible to show that the defendant's conduct underlying the currently charged sexual offense was, in fact, performed with the requisite sexual intent. In *People v. Daniels* (2009) 176 Cal.App.4th 304 (*Daniels*), the defendant was charged with kidnapping for rape. At trial, the evidence showed that in 2005, the defendant encountered his intoxicated and essentially unconscious victim outside a bar and transported her to his motel room, where he placed her on the bed. (*Id*. at pp. 308-309.) Soon after, she awoke and fled. (*Id*. at p. 309.) Under Evidence Code section 1101, the prosecution was permitted to establish that in 1990, the defendant committed a rape after breaking into his victim's house. In affirming the defendant's conviction, the appellate court held that the 1990 rape had been properly admitted under Evidence Code section 1101, concluding that "[t]he 1990 events and the 2005 events were sufficiently similar to support an inference that defendant acted

with the same intent on both occasions." (*Daniels, supra,* 176 Cal.App.4th at p. 315.)

Although *Daniels* examined the application of Evidence Code section 1101, its holding establishes the propriety of the trial court's ruling under Evidence section 1108.[15] *Daniels* demonstrates that Evidence Code section 1101 permits the admission of prior sexual misconduct to show the defendant's sexual intent with respect to the charged offense. In our view, because Evidence Code section 1108 was intended to enhance the admissibility of prior misconduct when sexual offenses are charged, the same is true for that section. Accordingly, the trial court did not err in admitting the 1974 incident to establish appellant's intent, and thereby show that his acts were, in fact, a sexual assault, or attempted sexual assault. (See also *People v. Wilson* (2008) 166 Cal.App.4th 1034, 1043-1054 [under Evidence Code sections 1101 and 1108, trial court properly instructed jury that it could consider defendant's demonstrated sexual misconduct to establish his intent regarding other charged sex crimes].)

Appellant contends the trial court improperly assessed the prospect for prejudice under Evidence Code section 352, arguing that evidence of the uncharged crimes was prejudicial in light of the jury instructions. The trial court instructed the jury with a modified version of CALCRIM No. 1191, which stated that if the jury found appellant had committed the uncharged crimes in 1974, it was permitted, but not required, to conclude that appellant acted with the intent to commit felony murder predicated on rape, had a scheme or plan to do so, or was disposed or inclined to commit sexual offenses. Appellant argues that the

---

[15] Although the 1990 rape in *Daniels* was also admitted under Evidence Code section 1108, the appellate court did not discuss that ruling. (*Daniels*, *supra*, 176 Cal.App.4th at pp. 315-318.)

35

instruction permitted the jury to consider the evidence for an improper purpose, namely, to determine the identity of Jones's assailant.  We disagree.

CALCRIM No. 1191, as provided to the jury, stated:  "If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence.  It is *not* sufficient by itself to prove that *the defendant* is guilty of murder or that the rape special circumstance is true.  The People must still prove each charge and allegation beyond a reasonable doubt.  [¶]  Do *not* consider this evidence for any other purpose except for the limited purpose as stated above."  (Italics added.)  Accordingly, the instruction, viewed as a whole, directed the jury to look at the other trial evidence to determine whether appellant was Jones's assailant *before* determining his culpability under a felony murder theory predicated on rape.  We presume the jury followed the instruction.  (*People v. Delgado* (1993) 5 Cal.4th 312, 331.)  In sum, Tulach's testimony was properly admitted.


C.  *Adequacy of the Evidence*

Appellant contends there was insufficient evidence to support his conviction for first degree murder.  The prosecution relied on four distinct theories of first degree murder:  (1) premeditated and deliberate murder, (2) felony murder predicated on kidnapping, (3) felony murder predicated on robbery, and (4) felony murder predicated on rape.  In finding appellant guilty of first degree murder, the jury found true the special-circumstance allegations underlying the three felony-murder theories.  As explained below, appellant has shown no reversible error

because there is substantial evidence to support his conviction on the theory of premeditated and deliberate murder and two of the felony-murder theories.[16]

### 1. *Deliberate and Premeditated Murder*

Appellant maintains the record discloses no evidence that Jones's murder was the product of deliberation and premeditation. He argues that there is only "conjecture" regarding Jones's death, and that "no one but the killer -- or killers -- knows where, when, or why Jones was murdered." Although the focus of appellant's contention is on deliberation and premeditation, we begin by observing there is sufficient evidence (1) that appellant killed Jones, and (2) that the killing was intentional. Kuhnke testified that "Joe the Plumber" admitted killing a girl and burying her "in the hills or the woods," and other witnesses testified that appellant was known as "Plumber Joe."[17] The record otherwise supports the

---

[16] "'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

[17] Appellant suggests that Joe the Plumber's admission could not be a reference to Jones, as her body was not "buried" anywhere. Clearly the evaluation of Kuhnke's testimony was for the jury. The record discloses, however, that the culvert in which Jones's body was found was located underneath a road, where it had gone undetected for over a month and where, but for the stench emitted by the decomposing body, it might *(Fn. continued on next page.)*

37

reasonable inference that the car in which Kuhnke heard appellant's statement was Jones's Camaro, which appellant openly displayed within hours of her disappearance.  Kuhnke's testimony, viewed in the context of the other evidence, including the DNA evidence and appellant's shifting accounts of how he acquired Jones's car, is sufficient to identify him as Jones's killer.  Furthermore, the fact that appellant killed Jones by stabbing her multiple times with a knife or similar weapon is sufficient to show an intent to kill.  (*People v. Becerra* (1963) 223 Cal.App.2d 448, 450.)

We further conclude that the evidence at trial established the existence of deliberation and premeditation.  Generally, "'"[a] verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill.  [Citation.]  'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance.  [Citations.]"'"

---

have remained.  Moreover, the jury was permitted to view the site, including the culvert and surrounding area.

Appellant also suggests that Kuhnke testified that Joe the Plumber attributed the killing to someone else.  We disagree.  The record discloses the following testimony from Kuhnke:

"[Prosecutor:]  Tell . . . the jury what the man Joe the Plumber said to you about a girl.

"[Kuhnke:]  '*I* killed a girl and buried her.'  That I remember distinctly.

"[Prosecutor:]  Is there a part that you don't remember distinctly?

"[Kuhnke:]  Yes.  I remember but not distinctly.

"[Prosecutor:]  What part do you remember but not distinctly?

"[Kuhnke:]  '*I* buried her in the hills or the woods.'"  (Italics added.)  Shortly afterward, Kuhnke explained that he could not distinctly recall whether Joe the Plumber said "in the hills" or "in the woods."

(*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069, quoting *People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) Nonetheless "'"[p]remeditation and deliberation can occur in a brief interval. The test is not time, but reflection. 'Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'" [Citation.]' [Citations.]" (*People v. Mendoza*, *supra*, 52 Cal.4th at p. 1069, quoting *People v. Sanchez* (2001) 26 Cal.4th 834, 849.)

"The necessary elements of deliberation and premeditation may be inferred from all the facts and circumstances as will furnish a reasonable basis for such inferences, and where the evidence is not in law insufficient, the matter is exclusively a question for the trier of fact to determine. [Citations.] Proof of circumstances occurring at the time of the killing, as well as circumstances before and after the killing, are competent to show deliberation and premeditation. [Citations.]" (*People v. Mulqueen* (1970) 9 Cal.App.3d 532, 544.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), our Supreme Court identified three kinds of evidence a reviewing court should consider in determining the existence of premeditation and deliberation, namely, planning activity, motive, and manner of killing.[18] It has subsequently cautioned that these

---

[18] In *People v. Lenart* (2004) 32 Cal.4th 1107, 1127, the court summarized the three *Anderson* categories as follows: "'"(1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing -- what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a
*(Fn. continued on next page.)*

factors "are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight. [Citation.]" (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420.)

Here, Kunhke's testimony, together with the other evidence, supported the inference that appellant placed Jones in her Camaro's trunk and drove it to Azusa Canyon, where he murdered her (see pt. A.2.c., *ante*). The evidence admitted at trial supports the reasonable inference that Jones was alive when she arrived at Azusa Canyon, as the DNA evidence established to a high probability that Jones contributed to the blood found in the Camaro's trunk, and as appellant acknowledges, "[h]ad [Jones] been placed in the trunk after she was mortally stabbed, there would have been blood all over the trunk floor[,] yet the police found only a small trace on the mat." In addition, as we elaborate below (see pt. C.2., *post*), the record also discloses sufficient evidence that appellant robbed and raped Jones in the course of murdering her.

Appellant's decision to murder Jones in an uninhabited location demonstrates planning. (*People v. Silva* (2001) 25 Cal.4th 345, 369 ["A rational trier of fact could infer . . . that defendant selected th[e] location [for the murder] because it was a place where no potential witnesses or rescuers could see [him and the victim.] . . . Thus, the murder's isolated location, selected by defendant, is itself evidence of planning."].) The fact that appellant concealed Jones's body in culvert, together with the evidence of robbery and rape, is sufficient to establish a motive for the murder, namely, to prevent the detection of his other crimes. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1019 ["The motive of eliminating

_____

particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2).'"

40

possible witnesses in cases involving abduction and rape is often inferable from the circumstances of such crimes."]; see *People v. Kipp* (2001) 26 Cal.4th 1100, 1128 [evidence that defendant took substantial property from victim and raped her at the time he killed her supported reasonable inference that the killing was for the purpose of robbery and rape].) Furthermore, as the evidence showed that appellant robbed and raped Jones before killing her (see pt. C.2., *post*), the manner of killing -- by multiple wounds largely on her neck and chest from a knife or similar weapon -- was consistent with deliberation and premeditation, rather than a sudden violent impulse. (*People v. Robertson* (1982) 33 Cal.3d 21, 48-49 [because evidence showed that defendant drove victims to secluded areas and raped them before he killed them with a knife, multiple wounds on victims were consistent with deliberation and meditation]; *People v. Pride* (1992) 3 Cal.4th 195, 248 [presence of multiple knife wounds largely in confined areas of victims' bodies was evidence of reflection].) In sum, there is sufficient evidence that Jones's murder was deliberate and premeditated.

### 2. *Felony Murder*

Appellant contends there is insufficient evidence to support the special-circumstance findings that he committed felony murder predicated on three distinct theories, namely, that Jones's murder was committed while he was engaged in the commission, or attempted commission, of kidnapping, robbery, and rape. Generally, "[s]ection 189 imposes culpability for first degree murder when a killing is committed during the commission or attempted commission of a statutorily enumerated felony. [Citations.] Section 190 provides that first degree murder 'shall be punished by death, imprisonment in the state prison for life without the possibility of parole, or imprisonment in the state prison for a term of

41

25 years to life,' with the penalty to be determined as provided in certain statutory provisions, including the felony-murder special circumstance statute (§ 190.2). Once the jury finds the defendant has committed first degree murder, the felony-murder special circumstance applies if the murder was committed during the commission or attempted commission of a statutorily enumerated felony, and subjects the defendant to a sentence of death or of life without the possibility of parole. (§ 190.2, subd. (a)(17).)" (*People v. Andreasen* (2013) 214 Cal.App.4th 70, 80.) Accordingly, any one of the special-circumstance findings regarding a specific felony-murder theory, if sound, was sufficient to support appellant's sentence of life without the possibility of parole.

As respondent concedes, one of the three felony-murder theories -- that predicated on the commission, or attempted commission, of kidnapping -- fails as a matter of law. Because section 189 did not include kidnapping as a predicate crime for felony murder until 1990 (*People v. Davis, supra,* 10 Cal.4th at p. 515, fn. 11), appellant could not be convicted of felony murder based on that crime. (*People v. Marshall* (1997) 15 Cal.4th 1, 37-38.) Nonetheless, an error of that type is not prejudicial when the jury also properly finds that the defendant engaged in felony murder on a legally adequate theory. (*Ibid*.) That is the case here. The jury was properly instructed on theories of felony murder predicated on robbery and rape, and as explained below, there is sufficient evidence to support its determinations.

a.      *Felony Murder Based on the Commission, or Attempted Commission, of Robbery*

Appellant challenges the sufficiency of the evidence regarding felony murder predicated on robbery, arguing that there is no evidence he formed the intent to steal Jones's property while she was alive.  We disagree.

For purposes of felony murder predicated on robbery, the evidence must show that the defendant had the intent to steal before beginning the fatal attack on the victim.  As our Supreme Court has explained, "[l]iability for first degree murder based on a felony-murder theory is proper when the defendant kills in the commission of robbery . . . . or any of the other felonies listed in section 189.  For conviction, the prosecution must establish that the defendant, either before or during the commission of the acts that caused the victim's death, had the specific intent to commit one of the listed felonies.  [Citations.]  Thus, to find a defendant guilty of first degree murder based on a killing perpetrated during a robbery, the evidence must show the defendant intended to steal the victim's property either before or during the fatal assault.  [Citations.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 642.)

Here, there is ample evidence that appellant intended to steal Jones's Camaro before he began the fatal attack on her in Azusa Canyon.  Generally, "when presented with evidence that a defendant killed another and took substantial property from the victim at the time of the killing, a jury ordinarily may reasonably infer that the defendant killed for the purpose of robbery.  [Citation]" (*Kipp*, *supra,* 26 Cal.4th at p. 1128.)  As noted above (see pt. B.1., *post*), the evidence showed that appellant selected Azusa Canyon as an isolated location to complete his crimes.  In view of that evidence, the jury could reasonably infer that

43

he intended to take Jones's Camaro before he killed her, as he had no other way to return to Long Beach.

Appellant's reliance on *People v. Morris* (1988) 46 Cal.3d 1, disapproved on another ground in *In re Sassounian* (1995) 9 Cal.4th 535, 543-544, fn. 5, is misplaced. There, the victim was fatally shot outside a bathhouse restroom. (*People v. Morris, supra,* 46 Cal.3d at pp. 10-11.) The victim was nude except for shoes and socks, and there was no evidence that he was carrying any personal property when killed. (*Id*. at p. 20.) At trial, the defendant was identified as resembling a person seen running from the bathhouse shortly after the shooting, and as a person who used the victim's credit card after the killing. (*Id*. at p. 11.) Our Supreme Court concluded there was insufficient evidence to support a finding of felony murder predicated on robbery, as the record supported no reasonable inference regarding when the defendant formed the intent to take the credit card. (*Id*. at p. 20.) Here, in contrast, there is adequate evidence that appellant planned to take Jones's Camaro before he killed her. In sum, the record discloses substantial evidence to support the special circumstance finding regarding felony murder predicated on robbery.

b. *Felony Murder Based on the Commission, or Attempted Commission, of Rape*

Appellant also challenges the sufficiency of the evidence regarding felony murder predicated on rape, arguing that there is no evidence that he acted with the intent to commit rape, notwithstanding the fact that Jones's body was naked when discovered. He relies on four Supreme Court cases in which it was determined that a murder victim's unclothed state, standing alone, did not demonstrate the defendant's intent to commit a sexual assault. (*People v. Craig* (1957) 49 Cal.2d

313 (*Craig*); *People v. Granados* (1957) 49 Cal.2d 490 (*Granados*); *Anderson*, *supra*, 70 Cal.2d 15; *People v. Johnson* (1993) 6 Cal.4th 1 (*Johnson*), disapproved on another ground in *People v. Rogers* (2006) 39 Cal.4th 826, 879.) As our Supreme Court observed in *People v. Kelly* (2007) 42 Cal.4th 763, 789 (*Kelly*), those cases support the proposition that """"the victim's lack of clothing . . . is insufficient to establish specific sexual intent."""" (*Id.* at p. 879, quoting *People v. Holloway* (2004) 33 Cal.4th 96, 139.)[19]

---

[19]     In *Craig*, the defendant went to a bar, where he remarked that he "would 'like to have a little loving,'" and later threatened to punch a woman who refused to dance with him. (*Craig*, *supra,* 49 Cal.2d at pp. 315-316.) After leaving the bar, he encountered the victim -- a different woman. Her body was discovered under a car in a service station. (*Id.* at p. 316.) She was lying on her back, with her legs apart, wearing a ripped raincoat over a nightgown and panties, which had been torn open. (*Ibid.*) No semen was found. (*Id.* at p. 317.) As her injuries showed that she had been strangled and dragged underneath the car, the Supreme Court concluded that the evidence showed "a terrific struggle," but no intent to commit rape. (*Id.* at p. 319.)

In *Granados*, the defendant, who lived in the same house as his victim, killed her with a machete. (*Granados, supra*, 49 Cal.2d at pp. 493-494).) The victim was found lying on the floor of her bedroom, with her skirt positioned above her genitals and an apron pulled below them, thus exposing a portion of her hips. (*Id.* at p. 494.) As her genital area was uninjured, and no semen was present, the Supreme Court concluded there was insufficient evidence of an intent to commit rape. (*Id.* at p. 497.)

In *Anderson*, the defendant lived with the ten-year-old victim, whom he killed by repeatedly stabbing her with a knife. (*Anderson*, *supra,* 70 Cal.2d at pp. 19-21.) The victim was found unclothed on the floor of her bedroom, and her bloody and ripped clothing was distributed throughout the house, as was her blood. (*Ibid.*) Blood was discovered on the defendant's socks and underwear. (*Id.* at p. 24.) Although there was a cut in the victim's genital area, no semen was found. (*Id.* at pp. 21-22.) As there was no evidence the defendant ever disclosed a sexual interest in the victim, the Supreme Court determined there was insufficient evidence of sexual intent. (*Id.* at pp. 34-36.)

In *Johnson*, the defendant killed a mother and her daughter in their home, and then set fire to it. (*Johnson, supra*, 6 Cal.4th at pp. 14-15.) When arrested, the defendant admitted having had sex with the daughter before the killings. (*Ibid.*) With respect to the
*(Fn. continued on next page.)*

45

*Kelly* is instructive regarding the application of that proposition. There, the defendant was charged with a 1993 murder on theories of felony murder predicated on rape and robbery. (*Kelly, supra,* 42 Cal.4th at p. 770.) At trial, the evidence showed that the defendant frequented a fitness center, where he befriended several women, including the victim. (*Ibid*.) After the victim disappeared, her naked body was found wrapped in a blanket under a bed in the apartment of the defendant's former girlfriend, which she had left unoccupied for a period. (*Id*. at pp. 774-775.) When discovered, the body was decomposed, and provided no evidence of a sexual assault. (*Id*. at p. 775.) A neighbor of the girlfriend testified that on one occasion, he looked across the street into her apartment, and saw a man resembling the defendant with an unclothed woman resembling the victim. (*Id*. at p. 775.) To establish the murderer's identity and a "'common design or plan,'" evidence was admitted of uncharged misconduct by the defendant, including three rapes and an assault on his former girlfriend (Evid. Code, § 1101). (*Kelly, supra,* at pp. 782-787.)

Following the defendant's conviction, the Supreme Court rejected his challenge to the sufficiency of the evidence, which relied on the group of cases discussed above, as well as the lack of physical evidence that the victim had been sexually assaulted. (*Kelly*, *supra*, 42 Cal.4th at p. 789.) After noting the decomposed state of the victim's body "might readily explain" the absence of that physical evidence, the court identified three items of evidence that collectively sufficed to support the conviction: the fact that body was nude when discovered, the neighbor's testimony, and the defendant's pattern of raping and robbing

---

mother, however, the court concluded that her partially clothed body, by itself, was insufficient to show sexual intent. (*Id*. at pp. 41-42.)

women.  (*Ibid*.)  In distinguishing the group of cases, the court stated that "the finding of an intent to rape rests on considerably more than the victim's nudity." (*Ibid*.)

The rationale in *Kelly* applies here as well.  The evidence supported the jury's conclusion that appellant took Jones to Azusa Canyon, an area familiar to him as a place for getting "pussy," and killed her with a knife or similar weapon. Jones's body was naked when discovered.  According to Sergeant Perry, she was lying on her back with her legs spread apart, in a culvert approximately three feet wide and four feet high.[20]  Although Dr. Sathyavagiswaran was unable to examine Jones for a sexual assault because maggot activity had caused considerable tissue loss in her genital region, he stated that maggot activity generally starts in areas with "trauma."  Furthermore, Tulach's testimony that appellant attempted to assault her sexually established his propensity to engage in sexual assault.  In our view, the record is sufficient to establish an intent to commit rape.

Appellant maintains that Jones's lack of clothing showed only that he intended to impede her identification, arguing that the prosecutor effectively conceded that point during closing arguments.  However, a reasonable jury was not compelled to determine that delaying identification was the reason for Jones's nakedness, as appellant failed to take other steps to prevent identification.  Indeed, her shoes were found near her body.  Furthermore, no apparent effort was made to destroy Jones's fingerprints or her teeth, which enabled investigating officers to identify her on the basis of her dental records.

---

[20]     As noted above, the jury was taken to Azusa Canyon, where the jurors viewed the culvert (see fn. 22, *ante*).

47

Nor did the prosecutor concede that Jones was left unclothed to impede her identification. During the opening portion of closing arguments, the prosecutor contended that Jones's nakedness, coupled with the other evidence, established appellant's intent to commit a rape. Defense counsel argued that only a "dumb" murderer would steal a car and kidnap its owner in Long Beach, transport the owner to Azusa Canyon, kill her, and immediately return to the area where the car had been stolen. In rebuttal, the prosecutor maintained that appellant's pattern of conduct was not "stupid," as appellant was confident that he had left Jones's body in circumstances likely to delay her discovery and identification. In sum, the record discloses substantial evidence to support the special circumstance finding regarding felony murder predicated on rape.

### D. *Ineffective Assistance of Counsel*

Appellant contends his defense counsel rendered ineffective assistance by engaging in advocacy that engendered conflicts with the trial court. As explained below, we reject his contention.

"In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citations.] Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 357.)

48

Here, appellant does not contend that defense counsel failed to challenge the prosecution's evidence or otherwise advance a defense. Indeed, the record discloses that defense counsel engaged in vigorous advocacy at trial. Rather, appellant maintains that counsel's advocacy often conflicted with the trial court's rulings regarding discovery, the admission of evidence, the examination of witnesses, and other matters. At various points, the court informed defense counsel that it was considering the imposition of sanctions and finding him in contempt of court.

Generally, the trial court and the prosecution are obliged to act in a respectful manner toward defense counsel, and a failure to do so in the jury's presence may constitute reversible error. (*People v. Black* (1957) 150 Cal.App.2d 494, 496-505 [trial court's repeated and unwarranted hostile interactions with defense counsel in the jury's presence mandated reversal of the judgment]; *People v. Espinoza* (1992) 3 Cal.4th 806, 820-821 [stating that a prosecutor's rude and intemperate conduct toward defense counsel requires reversal of the judgment if it renders trial unfair].) However, appellant has cited no case -- and we are aware of none -- holding that whenever vigorous advocacy by defense counsel conflicts with the trial court's rulings, counsel's performance is deficient, for purposes of a claim of ineffective assistance of counsel.

On the record before us, appellant has shown no prejudice from defense counsel's conduct or the court's reaction to it. He argues that "hundreds of pages of [the reporter's] transcript are consumed by colloquies . . . between the court and defense counsel over what the court viewed as counsel's attempts to mislead it and the jury, and counsel's refusal to abide by the court's orders and evidentiary rulings." (Italics deleted.) After examining the portions of the reporter's transcript identified in appellant's opening brief, we have determined that only

49

four brief passages concern an interaction between the court and defense counsel in the presence of the jury. Those passages show only that the trial court heard or sustained objections to certain questions by defense counsel. The record otherwise reflects the court's diligent efforts to maintain a courteous atmosphere in the courtroom throughout the trial.

In an effort to show that defense counsel engaged in conduct prejudicial to his defense in the jury's presence, appellant's reply brief directs our attention to defense counsel's performance with respect to two matters. The first concerns counsel's cross-examination of Detective Davis regarding his 2009 interviews with appellant. When counsel asked whether appellant told Davis that he was going to return the Camaro "back" to Brummet, Davis answered in the negative. The prosecutor objected to the question, and requested that defense counsel identify where in the transcript of the 2009 interviews appellant had made such a statement. After examining the transcript, Davis noted that appellant said only that he intended to sell the car to Brummet. Defense counsel then conceded that the word "back" was not in the transcript, and the trial court sustained the prosecutor's objection.

Appellant maintains that defense counsel's examination of Detective Davis was prejudicial because it discredited him as a liar before the jury, and enabled the prosecutor to argue in closing argument that he had "deliberately misrepresent[ed]" statement during the 2009 interviews. We disagree. During the examination, defense counsel affirmatively acknowledged the word "back" was not in the transcript when that fact was drawn to his attention. Viewed in context of the lengthy trial, which involved the examination of many witnesses, defense counsel's mistaken question on a single topic was unlikely to have influenced the

jury. Accordingly, there is no reasonable likelihood that there would have been a more favorable outcome for appellant had defense counsel not asked the question.

The second aspect of defense counsel's performance concerns his efforts to develop the theory that in 2009, appellant suffered from memory loss. Appellant argues that his counsel suggested during voir dire and opening statements that appellant suffered from Alzheimer's disease or memory loss, but offered no expert testimony regarding those matters at trial, which permitted the prosecutor to comment on that omission during closing arguments. As explained below, we reject that contention.

During voir dire, defense counsel told prospective jurors that he "may" offer an expert on Alzheimer's disease or dementia. Later, in the opening statements, defense counsel stated there would be evidence that in 2009, appellant could not "remember what happened 25 years ago." At trial, defense counsel offered no expert testimony, but attempted to demonstrate appellant's memory loss by cross-examining Detective Davis regarding the 2009 interviews. Davis acknowledged that at various points during the 2009 interviews, appellant described his use of methamphetamine and stated that he could not recall certain facts. Later, during a conference outside the jury's presence, the trial court barred defense counsel's cross-examination of Davis regarding a statement by appellant that in 2005 he had been diagnosed as suffering from Alzheimer's disease. In so ruling, the court determined that defense counsel had misled it regarding the existence of medical records to support appellant's statement, and identified that conduct as potentially an incident of contempt. Later, in closing arguments, the prosecutor commented on defense counsel's failure to offer expert testimony.

The record does not demonstrate a deficiency in defense counsel's performance before the jury. Although counsel mentioned the possibility of expert

51

testimony during voir dire, he honored his opening statement by providing evidence of memory loss.  In sum, appellant has shown no ineffective assistance of counsel.

## DISPOSITION

The special-circumstance finding that the murder was committed during the commission, or attempted commission, of a kidnapping is ordered stricken, and the judgment, so modified, is affirmed in all other respects.

### CERTIFIED FOR PARTIAL PUBLICATION

MANELLA, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.