Filed 10/28/21  P. v. Mabe CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E075317 |
| v. | (Super.Ct.No. INF1600509) |
| THOMAS DEAN MABE, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mark E. Johnson, Judge.

Affirmed, as modified, in part, reversed in part, and remanded with directions.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Arlene A. Sevidal and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

Around 3:30 a.m., defendant Thomas Dean Mabe broke into a condominium in which a husband and wife were sleeping.  He awoke them by orally copulating the

husband and groping the wife. As the wife called 911, defendant kept asking the husband, "[W]he don't you let me give you another head job?" After defendant was arrested, handcuffed, and placed a patrol car, he said to a police officer, "Let me suck your dick."

As a result, defendant was convicted on six counts, including assault during a first degree burglary with the intent to commit oral copulation. (§ 220, subd. (b).)[1]

Defendant contends:

(1) The trial court erred by admitting evidence that defendant had previously committed attempted sexual battery and child annoyance.

(2) The trial court erred by admitting jailhouse phone calls in which defendant's lover urged him to act "crazy."

(3) There was insufficient evidence of unlawful restraint to support defendant's conviction for felony sexual battery. (§ 243.4, subd. (a).)

(4) There was insufficient evidence of circumstances likely to produce great bodily harm or death to support defendant's convictions for felony elder abuse (§ 368, subd. (b)(1)); or, in the alternative, the trial court erred by failing to instruct on the lesser included offense of misdemeanor elder abuse. (§ 368, subd. (c).)

We will hold that defendant's prior sexual offenses were similar enough to the charged offenses to be relevant and admissible as evidence of both intent (Evid. Code,

---

**1** This and all further statutory citations are to the Penal Code, unless otherwise specified.

§ 1101, subd. (b)) and propensity (Evid. Code, § 1108); moreover, they were not unduly prejudicial. We will further hold that defendant's apparent agreement with his lover's suggestion that he act crazy was relevant and admissible to show consciousness of guilt.

We agree, however, with defendant's contention that there was insufficient evidence to support his convictions for felony sexual battery and felony elder abuse. We will reduce these convictions to misdemeanor sexual battery and misdemeanor elder abuse, respectively, and remand for resentencing.

I

STATEMENT OF FACTS

A.  *Prosecution Evidence*.

Spouses John and Jane Doe[2] lived in a ground-floor condo in a gated country club community in Palm Springs. John was 71; Jane was 69.[3]

On the night of April 20-21, 2016, they were at home, asleep in the master bedroom. All the doors and windows were locked. John was lying on his side, in the nude.

Around 3:30 a.m., a man standing by the side of the bed turned John over onto his back and started to orally copulate him. John assumed it was his wife. He reached toward the person and felt an erect penis and testicles.

---

[2]     The trial court ordered that the victims be referred to in the record by these fictitious names. (See § 293.5.)

[3]     The trial court observed for the record that, at trial, the Does "look[ed] like folks in their 70s."

3

The man lay across John's chest and grabbed Jane's breast and "pubic area" in an "incredibly aggressive and invasive" manner. Then he grabbed her chin in a "rough" and "strong" manner. She assumed it was her husband. She said, "[N]ot so rough." "What the hell are you doing?"

John pushed the man away and got up. Jane turned on a light. John and Jane both later identified the person they saw as defendant. Defendant was six feet six inches tall. He was wearing a shirt, pulled back over his head, but with his arms in the sleeves. He was naked from the waist down.

Both John and Jane asked who he was and what he was doing there. Defendant gave his true name. He said he had come in through the front door. "You sent me a key," he asserted. He also said he was John's brother.

Jane ran into the kitchen and called 911. Meanwhile, defendant got dressed. He wandered toward the spare bedroom, then back to the master bedroom. As he did so, he kept "propositioning" John, saying, "[W]ould you like a blow job?" "You know you love it."

Defendant went into the dining room, where he sat in a chair, then sat on the floor. He had been calm, but he became "agitated" because Jane was screaming on the phone. He told her, "[Q]uit yelling, quit screaming." He "walked quickly" into the kitchen, came up behind her, and grabbed her "[r]oughly and firmly by the shoulders." Jane "didn't know if he was going to rape [her] or kill [her]." John "was fearful for [his] wife," so he pulled defendant away and punched him once in the head.

4

Just then, the police came in and arrested defendant. He was compliant. Three police officers each testified that defendant did not show any signs of being under the influence of drugs. He did not tell anyone that he was high on methamphetamine. He specifically told one officer that had *not* used methamphetamine.

As defendant was sitting in a patrol car, handcuffed, he said to an officer, "Let me suck your dick. Come on. No one will see. Turn off all of the lights."

Later, John and Jane found that the screen had been removed from the sliding glass door separating their spare bedroom from a patio outside. The screen had also been removed from a living room window; that window had been opened and was the apparent entry point. On the patio, there were two red curtains and a stained pair of men's underwear.

B.     *Prior Sexual Offenses*.

1.     *Rachel D.: Attempted sexual battery*.

Rachel D.[4] was homeless. She admitted one prior conviction for commercial burglary and two prior convictions for using someone else's checks.

On March 1, 2016, sometime before dawn, she was sitting outside a Circle K in Palm Springs. Defendant approached her. He was wearing a tank top, briefs, and polka dot socks. He was rubbing his penis over the briefs.

---

[4]     Although Rachel D. testified under her full name, we accord her protective nondisclosure. (Cal. Rules of Court, rule 8.90(b)(4).)

"[H]e was saying a lot of really vulgar stuff and grabbing other women." He told Rachel several times that "he wanted to eat [her] pussy." He tried to grab her "behind" and her breasts.[5] She told him to leave her alone, but he kept rubbing himself. When another woman walked by, defendant grabbed that woman's "behind." About seven minutes after defendant first showed up, Rachel left.

By coincidence, Rachel and defendant were each arrested later that day. (Defendant's arrest was for his second prior sexual offense; see part I.B.2, *post.*) They were placed in cells across from each other. Defendant yelled that "he was going to fuck [her] and he was going to bend [her] over and he wanted to eat [her] pussy."

### 2. *Lotus: Child annoyance.*

Lotus[6] was 16 and going to high school in Palm Springs. On March 1, 2016, at 7:15 a.m., as she started walking to school, defendant came out from the gate of a nearby house and started following her.

After defendant had been following Lotus for about three minutes, just as the street went over a bridge, he started to speed up. She tried to speed up, too, but he caught up with her. He asked how old she was; she said 16. He tried to grab her arm. He said, "If you were 18, I would hit that."

---

[5]     In her statement to the police, Rachel had not mentioned that defendant tried to grab her.

[6]     The trial court ordered that Lotus's last name be redacted from the record.

Lotus ran out into the street and tried to get the attention of passing drivers. One driver pulled over. He said he had seen "the guy" following her and trying to grab her. He offered to drive her to school; she accepted. When she got to school, the police were called.

The driver who picked Lotus up corroborated her testimony. However, he did not see defendant "touch" Lotus.

As a result of this incident, defendant pleaded guilty to child annoyance. (§ 647.6, subd. (a).)

C.  *Defense Evidence*.

1.  *Defendant's testimony*.

Defendant lived in Palm Springs with his "lover," Christopher Strickland. Defendant had been using methamphetamine daily for 13 years.

The night before April 20-21, 2016, defendant "partied" at a house and then stayed there overnight. On April 20-21, 2016, he was wearing a pair of underwear that he found abandoned at the house.

While defendant was at a park, a girl "came out of nowhere," asked to use his lighter, and shared some heroin with him. Later, around 11:00 p.m., he bought $10 worth of methamphetamine and smoked it with an acquaintance.

He had missed the last bus home, so he went to the golf course of the Does' country club. He was looking for a place "where [homeless people] could sleep", so he

7

could either sleep there or "scare them, mess with some of those people . . . ." He had some red drapes in a bag that he intended to give to a friend.

Hearing a voice, defendant went toward it, across the golf course and up to the Does' condo. He put the drapes on some chairs because he thought they would look "neat" there. When he "peed on a bush," he noticed a brown stain on the underwear, so he took it off; [7] however, he put his pants back on. He denied taking his pants off again later.

He saw lights on in the condo and he saw bicycles out on the patio. He "just wanted somebody to play with." He wanted "somebody to talk to, . . . [to] see if there was anybody in there, maybe lie down and go to sleep." He therefore removed the screen from the sliding glass door and knocked "really softly." The décor in the spare bedroom made him think the condo was a model home. He saw a bed and decided to go inside and go to sleep. He tried to open the sliding glass door, but it was locked. He planned "to wash the sliding glass door where [he] put [his] prints from [his] hands."

Defendant noticed that the screen on another window was on backwards. He took it off, intending only to put it back on properly. Just then, however, he started sweating and shaking. He was afraid he was having a bad trip. He therefore opened the window, by bending it near the latch, and went inside, so he could "use the phone and call an ambulance . . . ." He claimed he did not realize that he had broken into someone's house. However, he did think "if there's somebody in here, I could get in trouble."

---

[7] He admitted that he had seen the stain before he put the underwear on.

He heard snoring. "I thought ewww," he testified. However, he also found it funny. He also testified that the snoring "attracted" him. When he heard it, "[his] goals . . . changed."

He followed the snoring to the master bedroom, where he saw two people asleep in bed. He decided to lie down in the space between them and go to sleep. To get over John, he rolled him onto his back. In the process, John's hands "c[a]me down on [defendant's] head." "I thought," he testified, "maybe he thought that I was his wife" and the gesture was an invitation "to give him a blow job . . . ." Defendant therefore proceeded to orally copulate John.

Defendant denied touching Jane. Jane got out of bed, turned on the light, and screamed, "What are you doing in my bed?" John put defendant in an "arm bar." Jane left the bedroom, and John let go of defendant. Defendant denied saying anything about keys or being John's brother.

Defendant left the bedroom, went through a door, and found the spare bedroom that he had seen earlier. Then he went to the dining room and sat down. He asked John, "Would you mind if I sucked your dick?," but only once. He did not leave because he did not know where the door was.

Jane was yelling into the phone and looking out the window. The yelling "irritated" him and he "told her to quit screaming." However, he was curious about what she was looking at, so he walked up behind her. Jane was startled and backed up into

9

him. He put his hands on her hips, just to "lead her around [him]." That was when John punched him.

Defendant admitted telling a police officer that "[he] wanted to suck his dick," to "flirt with him."

Defendant testified that, during his encounter with Rachel D., he was wearing spandex shorts, not briefs. He denied rubbing his penis or trying to grab her.

Defendant also denied following Lotus. He just happened to be going in the same direction. Lotus ran up to him and said hello. When she said she was 16, all he said was, "I bet there's times that you wish you were 18." He tried to grab her arm to stop her from stepping off the curb in front of an oncoming SUV. He did plead guilty to child annoyance, but only so he could get out of jail sooner.

2.    *Expert testimony*.

The defense called Dr. Michael Kania, a forensic psychologist and an expert in substance abuse. He testified that a large dose of methamphetamine can cause confusion, disorientation, and inability to "read[] social cues." Methamphetamine can also make a user impulsive, including sexually impulsive.

Defendant told Dr. Kania that, on April 21, 2016, he was "very intoxicated." Based on defendant's statements and behavior on that date, Dr. Kania believed he was under the influence of methamphetamine. When Dr. Kania interviewed him, 16 months later, defendant's thinking was not disorganized.

10

D.    *Rebuttal Evidence.*

Defendant told police that he went in the condo because he thought his brother lived there, had sent him a key, and had given him directions.  He intended to orally copulate his brother, though he conceded that they had never had sex before.  "[A]fter trying the back door . . . he decided to go in through the window."  He thought John was his brother.

He said he massaged the back of Jane's neck while she was asleep.  When she pulled away from him, "he got more aggressive . . . , grabbed her by the back of the neck, and pulled her head toward his groin," seeking oral copulation.  She was still asleep at that point.  He admitted propositioning John repeatedly.

He said that, in the kitchen, he grabbed Jane's waist "aggressively."  He admitted that he was trying "to freak [her] out."

II

STATEMENT OF THE CASE

Before trial, defendant pleaded guilty to count 8, misdemeanor failure by a transient to register as a sex offender.  (§ 290.011, subd. (a).)

In a jury trial, defendant was found guilty of:

Count 1:  Oral copulation on an unconscious person.  (Former § 288a, subd. (f); see now § 287, subd. (f).)

Count 2:  Assault on John Doe during the commission of first degree burglary with the intent to commit rape, sodomy, or oral copulation.  (§ 220, subd. (b).)

11

Count 4:  Felony sexual battery against Jane Doe, a restrained person.  (§ 243.4, subd. (a).)

Count 5:  First degree burglary.  (§§ 459, 460, subd. (a).)

Counts 6 and 7:  Felony elder abuse.  (§ 368, subd. (b)(1).)

Defendant was found not guilty on count 3, assault on Jane Doe during the commission of first degree burglary with the intent to commit rape, sodomy, or oral copulation.

Defendant admitted one strike prior (§§ 667, subds. (b)-(i), 1170.12) and one prior serious felony conviction enhancement (§ 667.5, subd. (a)).[8]

As a result, he was sentenced to a total of 37 years to life in prison.

III

EVIDENCE OF DEFENDANT'S PRIOR SEXUAL OFFENSES

Defendant contends that the trial court erred by admitting evidence of his prior sexual offenses against Rachel and Lotus.

A.    *Additional Factual and Procedural Background.*

The prosecution filed a motion in limine to admit this evidence.  Defense counsel objected "on due process grounds and 352."

---

[8]    Defendant also admitted one prior prison term enhancement.  (§ 667.5, subd. (b).)  However, Senate Bill No. 136 (2019-2020 Reg. Sess.), effective January 1, 2020, eliminated all prior prison term enhancements, except when the prior prison term is for a sexually violent felony; defendant's was not.  Hence, although the trial court did not formally strike this enhancement, it recognized that it could not impose it, and it did not.

12

The trial court ruled that the evidence was admissible under Evidence Code section 1108. "It shows a really impulsive act which . . . the felony charged here was. In terms of showing propensity, I think it's got . . . a very high amount of probative value. It's prejudicial. But I don't think it's any more prejudicial than any other prior sex offense . . . ." It also admitted it as relevant to intent under Evidence Code section 1101, subdivision (b).

The trial court instructed the jury that it could consider the prior sex offenses as evidence of intent (CALCRIM No. 375) and as evidence that defendant "was disposed or inclined to commit sexual offenses" (CALCRIM No. 1191A), and for no other purpose.

B.      *Discussion.*

Evidence Code section 1101, subdivision (a), sets up a general rule that evidence that the defendant has committed a crime in the past is inadmissible to prove that he or she committed the charged crime. In other words, it bars evidence that the defendant has a propensity to commit crimes.

Evidence Code section 1101, subdivision (b), states one exception to that rule. It makes evidence that the defendant has committed a past crime admissible "when relevant to prove some fact (such as . . . intent . . . ) other than his or her disposition to commit such an act."

Evidence Code section 1108, subdivision (a), states a second exception. It provides: 'In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made

13

inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352."

Last but not least, Evidence Code section 352 gives the trial court "discretion [to] exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"A trial court's rulings admitting evidence under Evidence Code sections 1101 and 1108 are reviewed for abuse of discretion. [Citations.]" (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 824.) "'"[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it."' [Citation.]" (*People v. Charles* (2015) 61 Cal.4th 308, 333.)

1. *Admissibility under Evidence Code section 1108.*

Preliminarily, defendant contends that his conduct toward Rachel did not constitute a "sexual offense" within the meaning of Evidence Code section 1108.

His trial counsel did not object on this ground below and thus forfeited this contention. (Evid. Code, § 353, subd. (a).)

It lacks merit in any event. "Sexual offense," as defined by Evidence Code section 1108, includes sexual battery (§ 243.4), whether completed or attempted. (Evid. Code, § 1108, subds. (d)(1)(A), (d)(1)(F).) A sexual battery can be committed by touching a person's breast or buttocks against their will for the purpose of sexual arousal, sexual

14

gratification, or sexual abuse. (§ 243.4, subd. (e)(1), (g)(1).) The touching may be either skin-to-skin or through clothing. (§ 243.4, subd. (e)(2).)

There was substantial evidence that defendant committed attempted sexual battery by trying, unsuccessfully, to grab Rachel's breast and buttocks. Rachel's testimony also afforded substantial evidence that defendant committed completed sexual battery by grabbing the buttocks of an unnamed woman who came walking by — indeed, apparently those of multiple other women.

Defendant notes that Rachel had not told the police that defendant tried to grab her. He argues that this fact was not before the trial court when it ruled, and therefore it erred.

We disagree, for two reasons.

First, Rachel did tell the police that defendant grabbed another woman's buttocks.

Second, the prosecution's motion in limine is not in the record. It is not part of the normal record (see Cal. Rules of Court, rule 8.320(b)), and defendant has not requested augmentation. Therefore, we do not know what facts were before the trial court. It does appear that the prosecution had not only Rachel's statement to the police, but also a *Mirandized* statement by defendant in which he "acknowledge[d]" the "incident." For all we know, he admitted trying to grab (or even actually grabbing) Rachel.

For the sake of completeness, we note one wrinkle: The jury was instructed that the People had presented evidence of "sexual battery against Rachel" — *not* attempted

15

sexual battery, and *not* sexual battery against an unnamed woman — and that it should consider this evidence only if it found that defendant did commit this offense.**9**

Because there was no evidence of a completed sexual battery against Rachel, this instruction was erroneous. The evidence, however, was properly admitted, regardless of the subsequent misinstruction. Moreover, defendant has not raised the misinstruction as a separate assignment of error. And wisely so. The misinstruction was entirely favorable to him. In effect, it directed the jury not to consider the attempted sexual battery against Rachel or the sexual battery against an unnamed woman actually shown by the evidence.

2.       *Admissibility under Evidence Code section 1101*.

Next, defendant contends that the two incidents were not relevant as evidence of intent.

"'Evidence of uncharged crimes is admissible to prove identity, common plan, and intent "only if the charged and uncharged crimes are sufficiently similar to support a rational inference" on these issues.' [Citation.] The degree of similarity varies depending on the purpose for which the evidence is offered. 'The least degree of similarity . . . is required in order to prove intent.' [Citation.] For this purpose, 'the uncharged misconduct must be sufficiently similar to support the inference that the defendant "'probably harbor[ed] the same intent in each instance.'"' [Citation.]" (*People v. Chhoun* (2021) 11 Cal.5th 1, 25.)

---

**9**       We commend the People for their candor in pointing this out in their brief.

16

"'[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' [Citation.]" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.)

The crime against Rachel was similar to the charged crimes in that: (1) the crime took place in the early morning hours, (2) the victim was a stranger, (3) the victim was vulnerable (i.e., Rachel was homeless and alone, whereas the Does were elderly and asleep), (4) the crime showed impulsivity and opportunism, (5) defendant was seeking oral copulation, (6) defendant made crude sexual demands, (7) defendant undressed before confronting his intended victim, (8) defendant also sexually touched a person other than the primary victim, and (9) defendant could not or would not recognize lack of consent. This went far beyond the minimum required similarity. Thus, this incident was relevant to show that, during the charged crimes, defendant did not really want to go to sleep or to call an ambulance; he was simply a sexual predator who ignored conventional boundaries.

The crime against Lotus was also similar to the charged crimes, in that (1) the victim was a stranger, (2) the victim was vulnerable (i.e., Lotus was only 16 and alone), (3) the crime showed impulsivity and opportunism, and (4) defendant could not or would not recognize lack of consent. However, there was also a fifth similarity: defendant was seeking oral copulation. The prosecutor represented to the trial court that, in the

17

*Mirandized* interview, defendant explained that "he was attracted to [Lotus] and wanted her to orally copulate him." For some unknown reason, this statement was never introduced at trial. Nevertheless, the trial court was entitled to rely on it in finding sufficient similarity. Thus, again, the incident was relevant to show that defendant intended to seek oral copulation when he entered the Does' home.

Understandably, defendant focuses on the differences between the incidents. He claims that he did not "assault" Rachel or Lotus; however, he did attempt to grab each of them, much as he later grabbed Jane Doe. Of course, there were other obvious differences: the crimes against Rachel and Lotus occurred outdoors, in public, whereas the crimes against the Does occurred indoors; Lotus was a teenager, Rachel's age was not stated, and the Does were elderly. However, absent an unusually robotic modus operandi, a prior sexual offense will always be different, in some respects, from a charged crime. The question is not whether there are differences, but whether there are sufficient similarities for the prior sexual offense to be probative. Here, there were.

Separately and alternatively, even assuming the evidence was not relevant to show intent, the trial court still properly admitted it under Evidence Code section 1108. On that view, the only error was in instructing the jury that it could also consider it as evidence of intent. (See *People v. Walker* (2006) 139 Cal.App.4th 782, 808-809.)

The relevant instruction also told the jury that, if it found that defendant committed the uncharged offenses, "you may, but are not required to, consider that evidence for the limited purpose of deciding whether the defendant acted with the intent

18

required" for the charged crimes. If, as we are assuming arguendo, the uncharged crimes were *not* sufficiently similar to show defendant's intent during the charged crimes, then we may safely conclude that the jury ignored them. "'[A]n instruction that tells the jury what kinds of rational inferences may be drawn from the evidence does not provide any insight jurors are not already expected to possess.' [Citation.]" (*People v. Najera* (2008) 43 Cal.4th 1132, 1139; see *People v. Chism* (2014) 58 Cal.4th 1266, 1299 [where instruction on adoptive admissions by silence was given, despite lack of evidence to support it, jury presumably disregarded it].) Thus, it is not reasonably probable that the error in the instruction affected the verdict.

3.    *Admissibility under Evidence Code section 352*.

Next, defendant contends that the two prior incidents were more prejudicial than probative.

"When determining the prejudicial impact of other sexual offenses admitted under Evidence Code section 1108, the trial court may consider the 'nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details

19

surrounding the offense.  [Citations.]'  [Citation.]"  (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1098-1099.)

In part, this contention simply reframes defendant's contention that the incidents were not similar to the charged offenses.  For the reasons already stated in part III.B.2, *ante*, we disagree.  They were so similar that they tended to prove intent as well as propensity.  Moreover, similarity must be balanced against remoteness; when a prior sexual offense is very remote, more similarity is required.  (*People v. Spicer* (2015) 235 Cal.App.4th 1359, 1384.)  Here, both prior incidents were very recent — they occurred just a month and a half before the charged crimes.  Hence, not much similarity was required.

Despite defendant's denials, it was reasonably certain that the prior incidents did occur.  Rachel accused defendant on the same day as he attempted to grab her.  He partially corroborated her account by yelling that "he wanted to eat [her] pussy." Similarly, Lotus's account was largely corroborated by the motorist who picked her up. While he did not actually see defendant "touch" her, she did not claim that defendant did. He still found defendant's apparent stalking of her so concerning that he turned around to rescue her.  Also, defendant had pleaded guilty to child annoyance.

The challenged evidence did not take up a great deal of time at trial and did not tend to confuse a properly instructed jury.  Thus, it also did not unduly burden the defense.

Defendant briefly asserts that the prior offense against Lotus was particularly inflammatory because Lotus was a child. Against that, however, must be weighed the fact that he did not engage in any overtly sexual behavior toward her. His comment, "If you were 18, I would hit that," was merely conditional; it was not nearly as crudely worded as his propositions to both Rachel and John. He only tried to grab Lotus's arm, not her breasts, crotch, or buttocks.

The trial court's explanation that defendant's prior sexual offenses were not more prejudicial than prior sexual offenses in general was reasonable and well within its discretion. Moreover, the charged offenses were so bizarre and outrageous that the prior sexual offenses paled in comparison.

Defendant relies on *People v. Earle* (2009) 172 Cal.App.4th 372, which held that the trial court erred by failing to sever a charge of indecent exposure from a charge of assault with the intent to commit rape. (See *id*. at p. 384.) In the process, the appellate court held that evidence of the indecent exposure would not have been admissible under Evidence Code section 1108 in a trial for the assault with the intent to commit rape, because it had no "tendency in reason" to prove a predisposition to rape. (*Id*. at pp. 396-400.) However, there is no hard-and-fast rule that evidence of one type of sexual offense is irrelevant to show a propensity to commit a different sexual offense. Here, defendant's prior sexual offenses — impulsively seeking oral copulation from vulnerable persons, with or without their consent — had a tendency in reason to show a predisposition to commit the charged offenses, which had a similar aim.

21

We therefore conclude that the trial court did not abuse its discretion by admitting the prior sexual offenses.

IV

PHONE CALLS URGING DEFENDANT TO "ACT CRAZY"

Defendant contends that the trial court erred by admitting jailhouse phone calls in which his lover urged him to "act crazy."

A.      *Additional Factual and Procedural Background*.

1.      *The jailhouse phone calls*.

Before defendant testified, the prosecutor sought to introduce three telephone calls between him, while in jail, and his lover, Christopher Strickland.

a.      *The first call*.

In the first call, on March 5, 2017, there was this exchange:

"STRICKLAND:  . . . Hey, uh — uh, remember what I say about go — about actin' crazy stuff like that?  You better hurry up and start doin' it mister. . . .  [¶] . . . [¶]

"STRICKLAND:  . . . Two years in — in a — in a mental place.  Sentences for like 28 years or ten years or something like that.  [¶] . . . [¶] . . .

"MABE:  Yeah that would be nice wouldn't it?  I can't . . .  [¶] . . . [¶]

"MABE:  I don't — I don't know.  I don't even know how to act crazy.

"STRICKLAND:  . . .  Sure you do.  You act — I remember how you used to get crazy here and you'd be on top of my — top of the entertainment center?  That's the crazy, okay.  [¶] . . . [¶] . . .

22

"MABE: Gosh.

"STRICKLAND: Yeah. Okay? There you go.

"MABE: All right, I'll keep it in mind."

b. *The second call*.

In the second call, on April 3, 2017, defendant said, "[T]hey're sendin' me to another doctor." Strickland replied, "Well, that's — that's a good thing, right?" They also said:

"STRICKLAND: Yeah, [i]t — yeah baby, you know, and come on just act crazy. That's all you gotta do.

"MABE: Yeah.

"STRICKLAND: Okay? I mean, I want you back, you know what I mean?

"MABE: I'll — I'll be there."

c. *The third call*.

In the third call, on January 8, 2020, they discussed the fact that defense counsel was trying to get ahold of Strickland. Defendant explained, "[J]ust tell him I did a lot of drugs." Strickland protested:

"STRICKLAND: . . . [W]hy would you — why would you say you do — do d — dru — oh m — that's just, uh, Tom, that . . .

"MABE: Well, that's why you gotta talk to him. He'll explain it to you. . . . It's the defense that he's puttin' up for the case. He got a, uh, blood test from when I went to the hospital . . . .

"STRICKLAND: Yeah.

"MABE: . . . to see how intox — because he says I was intoxicated, didn't know what I was doin'."

2. *The trial court's ruling*.

Defense counsel objected that the calls were irrelevant, because "we're not putting on a mental health defense." He also objected that Strickland's statements were hearsay.

The trial court ruled: "I think it goes to the weight. I think he does kind of acknowledge the statement. And it kind of shows an effort to puff your case, maybe tell some untruths to a doctor. So I will allow that." "I think there's some evidence that shows consciousness of guilt."

After the trial court had ruled, defense counsel reiterated "for the record" that he was objecting based on hearsay and "on relevance 352 grounds being that there is no mental health defense."

While defendant was on the stand, the three phone calls were played for the jury.

B. *Discussion*.

Defendant argues that the phone calls were irrelevant because he did not actually present a mental defense; rather, his defense ultimately was voluntary intoxication.

We agree with the trial court that the phone calls were relevant to show consciousness of guilt. In the first phone call, when Strickland suggested that defendant act crazy, defendant agreed, saying, "All right, I'll keep it in mind." He also agreed that it "would be nice" to be in a mental institution for two years rather than in prison for 10

24

or 28 years. It is reasonable to infer that defendant knew he was guilty and had no defense other than a fabricated one.

Likewise, in the second phone call, when Strickland urged him once again to act crazy, defendant agreed. Strickland added that he should act crazy because "I want you back . . . [.]" Defendant replied, "I'll — I'll be there," indicating that he would comply. Moreover, this implied that he had no way of "being there" other than to fabricate a defense.

Defendant's argument does not even apply to the third phone call. In it, defendant told Strickland — evidently for the first time — that he would be asserting voluntary intoxication. He also indicated that this had come as news to him; it was his defense counsel who had told him that "[he] was intoxicated, didn't know what he was doin'," which defense counsel had learned from hospital blood tests. This was relevant because it contradicted defendant's testimony that he committed the crimes while under the influence of methamphetamine.

Defendant also argues that the phone calls were more prejudicial than probative, in violation of Evidence Code section 352. His trial counsel failed to preserve this argument, for two reasons. First, his Evidence Code section 352 objection came too late, after the matter had been fully argued and the trial court had already ruled. Second, he argued that Evidence Code section 352 applied solely because the evidence was not probative — because "there is no mental health defense." He did not argue that, *even if* the evidence was probative, it was unduly prejudicial.

25

In any event, the evidence was not unduly prejudicial. As discussed, it was probative to show consciousness of guilt, in that defendant was considering fabricating (or did fabricate) a defense. Otherwise, it did not show defendant in a bad light at all.

Separately and alternatively, the admission of this evidence was harmless. Defendant asserts that the admission of evidence in violation of Evidence Code section 352 automatically violates due process, and therefore it triggers the "beyond a reasonable doubt" harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, 24. Not so. "A trial court's determinations under Evidence Code section 352 do not ordinarily implicate the federal Constitution, and are reviewed under the 'reasonable probability' standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 . . . ." (*People v. Gonzales* (2011) 51 Cal.4th 894, 924.) "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test." (*Ibid*.) If it is not reasonably probable that the admission of the evidence changed the result, it follows that the trial was not fundamentally unfair.

Here, it was not defendant's idea to act crazy; Strickland suggested it to him. And, while defendant said he would "keep it in mind," there was no evidence that he ever actually did act crazy. As already noted, the third phone call was a little different, because there, defendant was talking about a voluntary intoxication defense. The call, however, was ambiguous as to whether defendant was fabricating that defense. On one

26

hand, his attorney had had to tell him about it, and he was urging Strickland to support it. On the other hand, the call indicated that the defense was supported by a hospital blood test. As no such blood test was ever introduced at trial, in that respect, the call was actually somewhat exculpatory.

Last but not least, the evidence of guilt was overwhelming. For purposes of count 2 (assault on John Doe during the commission of first degree burglary with the intent to commit oral copulation) and count 5 (first degree burglary), the key issue was whether defendant entered the home with the specific intent to commit oral copulation. Similarly, count 4 required the specific intent to obtain sexual arousal or gratification or to commit sexual abuse. (§ 243.4, subd. (a).) And count 1 required knowledge that John was unconscious when defendant first orally copulated him. (Former § 288a, subd. (f); see now § 287, subd. (f).) The jury was instructed that voluntary intoxication was relevant to each of these issues. (§ 29.4, subd. (b); see also *People v. Reyes* (1997) 52 Cal.App.4th 975, 985.)

Defendant, however, admittedly broke into the condo, by removing a screen, forcing open a window, and entering through it. He admittedly did not have permission. He admittedly intended to wash his fingerprints off the sliding glass door. He admittedly knew John was asleep; he told the police that, while John was snoring, he manually masturbated him, then orally copulated him. He also admittedly orally copulated John without obtaining consent. He claimed that John put his hands on his head, which he took to be an invitation to perform oral copulation; however, he admitted that he knew

27

that John thought he was his wife.  Moreover, this excuse contradicted his statement to the police, and as he admitted at trial, "It didn't make a lot of sense at all."

Defendant's claimed explanations for entering the home were contradictory.  He said he wanted to "lay down and go to sleep."  However, he also said he "just wanted somebody to play with."  Then, he said was sweating and shaking and he just wanted to call 911.  He could not explain why he entered the Does' bedroom, except that John's "snoring kind of grabbed my attention."

Finally, the only evidence that defendant was actually intoxicated was his own testimony.  When the police interviewed defendant, he did not appear to be under the influence of drugs.  He specifically told them that he had *not* used methamphetamine.

As already discussed, the phone calls were only weakly prejudicial.  On this state of the evidence, there is no reasonable possibility that, if the phone calls had been excluded, defendant would have had a more favorable outcome on counts 1, 2, 4, or 5.  Defendant does not contend that the phone calls were prejudicial as to counts 6 and 7 (elder abuse).  And the jury acquitted defendant on count 3.

In sum, then, the phone calls were properly admitted, and even if not, their admission was harmless.

V

THE SUFFICIENCY OF THE EVIDENCE OF UNLAWFUL RESTRAINT

FOR PURPOSES OF FELONY SEXUAL BATTERY

Defendant contends that there was insufficient evidence of unlawful restraint of Jane to support his conviction for felony sexual battery on a restrained person (count 4).

"'We often address claims of insufficient evidence, and the standard of review is settled. "A reviewing court faced with such a claim determines 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] We examine the record to determine 'whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] Further, 'the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'"" [Citation.]" (*People v. Flinner* (2020) 10 Cal.5th 686, 748.)

Sexual battery against a restrained person requires a touching of an intimate part of another person, against the will of the person touched, for the purpose of sexual arousal, sexual gratification, or sexual abuse. (§ 243.4, subd. (a).) "Intimate part" is defined as "the sexual organ, anus, groin, or buttocks of any person, and the breast of a female." (§ 243.4, subd. (g).) It also requires that, when the touching occurs, the victim must be "unlawfully restrained by the accused or an accomplice . . . ." (§ 243.4, subd. (a).)

29

"[A] person is unlawfully restrained when his or her liberty is being controlled by words, acts or authority of the perpetrator aimed at depriving the person's liberty, and such restriction is against the person's will . . . ." (*People v. Arnold* (1992) 6 Cal.App.4th 18, 28.) "[A]n unlawful restraint is [not] limited to a physical restraint only." (*People v. Grant* (1992) 8 Cal.App.4th 1105, 1111.) However, "something more is required than the mere exertion of physical effort necessary to commit the prohibited sexual act." (*People v. Pahl* (1991) 226 Cal.App.3d 1651, 1661.)

The alleged victim of the sexual battery was Jane. The evidence showed that she was asleep when defendant grabbed her breasts and pubic area. He then grabbed her mouth area. Defendant told police that he "grabbed her by the back of the neck[] and pulled her head towards his groin."

When defendant grabbed Jane's breasts and pubic area, he was not physically restraining her. The grabbing itself could not constitute unlawful restraint, because it was "the mere exertion of physical effort necessary to commit the prohibited sexual act." Because the touching started when Jane was asleep, it cannot be argued that defendant restrained her by words or threat or other nonphysical means. The People argue that Jane was restrained because she was asleep and thus "incapable of resisting." Even assuming this could be considered a form of restraint, it was not restraint "by the accused."

Defendant's grabbing of Jane by the mouth and/or neck could not constitute sexual battery by restraint, because these were not "intimate part[s]." The People suggest these grabbings show that defendant was willing to restrain Jane "when she stirred."

30

Nevertheless, the restraint occurred after the touching of an intimate part had ended. Thus, the touching did not occur "while" Jane was unlawfully restrained. (§ 243.4, subd. (a).)

We therefore conclude that we must modify the judgment so as to reduce the conviction of felony sexual battery to misdemeanor sexual battery (§ 243.4, subd. (e)(1)).

VI

THE SUFFICIENCY OF THE EVIDENCE OF

CIRCUMSTANCES LIKELY TO PRODUCE GREAT BODILY HARM OR DEATH

FOR PURPOSES OF FELONY ELDER ABUSE

Defendant contends that there was insufficient evidence of circumstances likely to produce great bodily harm or death to support his convictions for felony elder abuse (counts 6 and 7). In the alternative, he contends that the trial court erred by failing to instruct on the lesser included offense of misdemeanor elder abuse (§ 368, subd. (c)).

Defendant was charged with elder abuse under subdivision (b)(1) of section 368. This subdivision, as relevant here, provides that "[a] person who knows or reasonably should know that a person is an elder or dependent adult and who, *under circumstances or conditions likely to produce great bodily harm or death*, willfully causes or permits any elder or dependent adult to suffer, or inflicts thereon unjustifiable physical pain or mental suffering" is guilty of elder abuse. (Italics added.)

The statute does not define "great bodily harm." However, in *People v. Burroughs* (1984) 35 Cal.3d 824, the Supreme Court was called on to construe another statute that

31

similarly did not define "great bodily harm."  It adopted the definition of "serious bodily injury" in section 243 — i.e., "'[a] serious impairment of physical condition, including, but not limited to the following:  loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement.'" (*People v. Burroughs*, *supra*, at p. 831.)  It further held that both terms are "'essentially equivalent'" to "great bodily injury."  (*Ibid*.)

"'*Great bodily harm . . .* means *great* as distinguished from *slight*, *trivial*, *minor* or *moderate harm . . . .* [Citation.]'" (*People v. Wells* (1971) 14 Cal.App.3d 348, 359, fn. 8.)  The jury here was so instructed.  (CALCRIM No. 830.)  "[T]he phrase 'likely to produce great bodily harm or death' . . . means '"the probability of serious injury is great."'  [Citation.]" (*People v. Chaffin* (2009) 173 Cal.App.4th 1348, 1352 [decided under § 273a, subd. (a)].)

"There is no requirement that a victim suffer actual injury or harm . . . . [Citations.]" (*People v. Clair* (2011) 197 Cal.App.4th 949, 956 [decided under § 273a, subd. (a)].)  "It is the likelihood of foreseeable injury, rather than whether such injury in fact occurs, that is relevant.  [Citation.]" (*People v. Lee* (1991) 234 Cal.App.3d 1214, 1220 [decided under § 273a, subd. (a)].)

In *People v. Racy* (2007) 148 Cal.App.4th 1327, the defendant used a stun gun on elderly victim Picaso.  (*Id*. at pp. 1330-1331.)  The appellate court found insufficient evidence that using a stun gun, standing alone, was likely to produce great bodily harm.

32

(*Id*. at pp. 1332-1333.)  Nevertheless, it held that there was sufficient evidence of circumstances likely to produce great bodily harm.  It explained:

"Defendant 'zapped' Picaso in the leg with a stun gun causing him substantial pain.  Presumably, to escape the situation and avoid more pain, Picaso retreated to his bedroom, and defendant gave chase following 'so close[ly]' that Picaso could not shut the bedroom door.  When Picaso moved to the bed, defendant repeatedly 'zapped' the stun gun 'in the air' and then 'tip[ped] [Picaso] over,' and grabbed his wallet, tearing Picaso's jean pocket.  The struggle moved the bed approximately one foot away from the wall and caused Picaso to trip.

"From this evidence, the jury reasonably could have concluded that defendant's close pursuit of Picaso (which prevented Picaso from locking the door) or the force defendant exerted on Picaso (which was strong enough to tip him over, tear his jean pocket, and cause a struggle in which Picaso tripped and the bed moved one foot) likely could have caused Picaso to fall and break a bone, causing him great bodily harm. . . . Picaso's knees are disabled and he is 74 years old, which, as a matter of common knowledge, is an age that carries with it an increased risk of bone fractures from a fall." (*People v. Racy*, *supra*, 148 Cal.App.4th at p. 1333.)

Here, defendant's use of force was very limited.  He orally copulated John while John was asleep.  He grabbed Jane's breasts and pubic area.  He also grabbed her "mouth area."  Defendant told police that he "grabbed her by the back of the neck[] and pulled her head towards his groin."  Once John awoke, however, he was able to push defendant

33

off of him.  Later, when defendant told Jane to stop yelling, he grabbed her shoulders "[r]oughly and firmly."  However, when John punched defendant and then pinned him to a countertop, defendant did not resist.[10]

Nothing about defendant's actions was likely to cause more than slight harm, even to elderly victims.  Unlike in *Racy*, there was no struggle in which the Does could have been injured.  And there was no evidence that the Does had any medical condition that would predispose them to injury, as in *Racy*.  There was no evidence that the Does so much as suffered bruises.

Waking up to find a naked stranger sexually assaulting you in your home is undoubtedly terrifying.  The Does' fear in this situation is totally understandable.  However, their fear arose from defendant's unpredictability; it was not about what he did, so much as it was about what he might do.  As Jane testified, "I didn't know if he was going to rape me or kill me."  The Does had to assume that defendant might use force.  The evidence however, shows that defendant did not intend to use force, even when punched.  Whenever the Does resisted, he backed off.

In closing argument, the prosecutor claimed that there was a risk of great bodily harm "because that's a stranger, 6'6".  He's already sexually assaulted them in bed.  And now he's going after [Jane]. . . .  [¶]  . . .  When you listen to that 911 call, you hear it. . . .  You hear the threat of great bodily injury or death.  And that's the point at which

---

[10]     The People state that, while John was in bed, defendant "push[ed] him down onto his back . . . ."  Not so.  The cited portion of the record says that it was John who pushed defendant away and off of him.

Jane Doe runs out. She runs out of her own home in fear of what's going to happen to her in her own home." All of these points tended to show that the Does were terrified, and reasonably so. However, they did not show a great probability of serious injury.

We therefore conclude that we must modify the judgment so as to reduce the two counts of felony elder abuse to misdemeanor elder abuse.

VII

DISPOSITION

The conviction of felony sexual battery on count 4 is reduced to misdemeanor sexual battery. The convictions of felony elder abuse on counts 6 and 7 are reduced to misdemeanor elder abuse. The convictions on all other counts are affirmed. The judgment with respect to the sentence is reversed and the matter is remanded for resentencing.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ_____
P. J.


We concur:

MILLER_____
J.

FIELDS_____
J.

35